## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### v.

## WESTINGHOUSE ELECTRIC CORPORATION.

### Civ. A. No. 80–853.

United States District Court,
D. New Jersey.

Oct. 29, 1986.

Lanier E. Williams, E.E.O.C., Philadelphia, Pa., for plaintiff.

Thomas L. Morrissey, Carpenter, Bennett & Morrissey, Newark, N.J., for defendant.

LECHNER, District Judge.

This age discrimination lawsuit was commenced in this Court more than six years ago; it has been assigned to and handled by more than one District Judge. By order, filed on July 16, 1986, it was reassigned to me. The action alleges violations of the Age Discrimination in Employment Act of 1967, as amended, (the "ADEA"), 29 U.S.C. § 621, *et seq.* Jurisdiction is found-

ed on 28 U.S.C. §§ 1337, 1343 and 1345. Presently before the Court is plaintiff's motion for summary judgment.

On April 1, 1977, the Westinghouse Electric Corporation ("Westinghouse") closed its plant located in Belleville, New Jersey, laying off a number of its employees. Most employees who were terminated and not relocated to other Westinghouse facilities were provided either with certain layoff income and benefits ("LIB") or, if they were so eligible, with early retirement benefits. The Equal Employment Opportunity Commission ("EEOC"), on behalf of Paul Meola, Sr. ("Meola") and other similarly situated Westinghouse employees at the Belleville plant, instituted this action alleging Westinghouse had violated provisions of the ADEA by failing to provide LIB to those employees eligible for early retirement under Westinghouse's pension plan.[1] The EEOC seeks (1) an injunction enjoining Westinghouse from denying LIB benefits to terminated employees eligible for early retirement, (2) appropriate LIB benefits and liquidated damages for all adversely affected employees from the Belleville plant and (3) other appropriate relief.

## I. *Procedural Background*

On April 14, 1977, a complaint alleging age discrimination against Westinghouse was filed on behalf of Meola with the United States Department of Labor ("Labor"). (Duffy Aff., filed July 9, 1986, Ex. L.) After conducting an investigation, Labor issued a letter of violation against Westinghouse on May 5, 1979. The letter charged Westinghouse with a violation of the ADEA for failing to provide LIB to employees laid off from the Belleville plant who were eligible for early retirement under Westinghouse's pension plan. The letter sought to commence conciliation efforts with Westinghouse. (Plaintiff's Brief, Ex. 4.) A conciliation conference, attended by Labor and Westinghouse representatives,

apparently took place on May 11, 1979. By letter, dated May 30, 1979, however, Westinghouse affirmatively denied that its policies were violative of the ADEA and declined to pursue the EEOC's efforts at conciliation. (Plaintiff's Brief, Ex. 5.)

Effective July 1, 1979, Congress transferred enforcement authority over the ADEA from Labor to the EEOC.[2] By letter, dated November 30, 1979, the EEOC (1) informed Westinghouse that it concurred in Labor's finding that Westinghouse's policy at the time the Belleville plant was closed violated the ADEA and (2) requested further information from Westinghouse. (Plaintiff's Brief, Ex. 6.) By letter, dated December 11, 1979, Westinghouse declined to provide the EEOC with further information. (Plaintiff's Brief, Ex. 7.)

By complaint filed with this Court on March 28, 1980, the EEOC commenced this action on behalf of Meola and other similarly situated Westinghouse employees from the Belleville plant. The complaint charged Westinghouse with violations of the ADEA "by its failure to provide severance pay to terminated employees age 55 and older who have had ten years service with the Defendant and who are eligible for retirement benefits." (Complaint ¶ 7.) The complaint sought to enjoin Westinghouse from denying severance pay to employees eligible for early retirement and sought damages for adversely affected employees. On March 3, 1981 the EEOC filed an amended complaint seeking the same relief but adding 64 former Belleville employees as plaintiffs.

In July, 1981, the parties each moved for summary judgment. Several hearings were held and apparently several opinions were filed, culminating in a final opinion filed in July, 1982 granting summary judgment in favor of Westinghouse and denying summary judgment for the EEOC.

---

1. It is noted at the outset that the EEOC characterizes Westinghouse's policy as denying LIB benefits to employees eligible for early retirement; Westinghouse characterizes its policy as providing a single stream of severance benefits to terminated employees.

2. *See* Reorg. Plan No. 1 of 1978, 3 C.F.R. 321 (1978), *reprinted in,* 92 Stat. 3781 (1978).

*EEOC v. Westinghouse Electric Corp.*, 577 F.Supp. 1029 (D.N.J.1982) (hereinafter cited as *"Westinghouse* (D.N.J.)").

The EEOC appealed and the Third Circuit reversed the summary judgment which had been awarded to Westinghouse. *EEOC v. Westinghouse Electric Corp.*, 725 F.2d 211 (3d Cir.), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984) (hereinafter cited as *"Westinghouse* (3d Cir.)"). The Third Circuit found the record to contain issues of material fact as to whether (1) Westinghouse had acted "willfully," thereby triggering a three year rather than two year statute of limitations, and (2) Westinghouse employees had received clear and unequivocal notice of the plant closing prior to the actual date of the closing. *Id.* at 225. In addition, the Third Circuit ruled that based upon the record before it,[3] Westinghouse had failed to establish defenses provided under the ADEA. Thus, the Third Circuit remanded for reconsideration of the statute of limitations issues. *Id.*

Upon remand, additional discovery was conducted. By notice filed May 21, 1986, the EEOC brought the present motion for summary judgment that the Westinghouse policy violates the ADEA and that the action is not barred by the statute of limitations.

Independent of the action now before this Court, the EEOC has pursued a similar lawsuit against Westinghouse in the United States District Court for the Eastern District of Pennsylvania. That action stems from a Westinghouse plant closing in Pennsylvania, apparently in 1982. By complaint, filed in November, 1983, the EEOC charged Westinghouse with violations of the ADEA for implementing the same policy at issue in this case. That complaint was amended in October, 1984 to expand the scope of the suit nationwide to address the Westinghouse policy as applied in all of its plants. After a trial, that court issued a scathing opinion finding the Westinghouse policy in violation of the ADEA. *EEOC v. Westinghouse Electric Corp.*, 632 F.Supp. 343 (E.D.Pa.1986) (hereinafter cited as *"Westinghouse* (E.D.Pa.)").[4] That case is apparently on appeal to the Third Circuit.

## II. *Facts*

Since 1960, Westinghouse has negotiated with representatives of its employees a variety of agreements providing certain benefits for the employees. Among the types of benefits provided by Westinghouse to its employees in 1960 were: retirement (Weaver Aff., filed July 9, 1986, Ex. B), insurance (*Id.*, Ex. C) and severance benefits (*Id.*, Ex. A, IV). Over time, these benefit plans have been modified and expanded as a result of continuing negotiations between Westinghouse and the employee representatives. Relevant to this action is the status of employee retirement and LIB benefits as they existed in 1977 when the events leading up to and culminating in the closing of the Belleville plant occurred. The essential components of the two plans as they existed in 1977 are not complicated.

*Retirement.* Westinghouse employees who began their Westinghouse employment at or before age 60 are entitled to begin receiving "normal retirement" benefits at age 65. (Weaver Aff., filed July 9, 1986, Ex. M § II A.) Employees with at least ten years of service with Westinghouse qualify for "early retirement." (*Id.* § II. C. I.) These employees may retire after age 60 and before age 65 with benefits somewhat reduced from what would obtain under normal retirement. Those employees with more than ten, but less than thirty, years of Westinghouse employment who are laid off after age 59 but before age 60 are eligible for early retire-

---

**3.** According to counsel for Westinghouse, the record before the Third Circuit consisted of "the benefit plans, collective bargaining agreements, and a single affidavit setting forth the dates on which the claimants were counselled [about severance benefits]." (Defendant's Reply Brief at 16 n. 6.)

**4.** It is unclear from its terms whether the *Westinghouse* (E.D.Pa.) opinion was intended to have nationwide application.

ment benefits. (*Id.* § II. C. 2.) Those employees with more than ten years of service and who are laid off as a result of a plant closedown after reaching age 55 and before age 60, are eligible for retirement benefits. (*Id.* § II. C. 3.) Employees with more than thirty years of Westinghouse service may qualify for "selected retirement." These employees may retire after reaching age 58 and before age 65 with benefits somewhat reduced from what would obtain under normal retirement. (*Id.* § II. D. 1.) Those employees with more than thirty years of Westinghouse service who are laid off as a result of a plant closing after reaching age 55 and before age 60 are eligible for selected retirement benefits. (*Id.* § II. D. 2.)[5]

*LIB.* Employees with more than two years of service with Westinghouse, who are not eligible for early or selected retirement and who are laid off, are eligible to receive LIB benefits. (*Id.* Ex. O, p. 2.)[6] Such employees are entitled to receive a "Total Maximum Sum" defined to equal one week's pay for each full year of service with Westinghouse. The Total Maximum Sum must be not less than four weeks' pay. (*Id.*, p. 3.) Where, as in this case, the plant closing is expected to last for more than six months, each eligible employee must choose one of three options for receiving his Total Maximum Sum.

Option A, entitled "Lump Sum," requires Westinghouse to pay the entire amount at once and the employee to sever his relationship with the company, relinquishing his recall and service credits. (*Id.*) Under Option B, Westinghouse is required to make weekly payments to the employee sufficient to make up the difference between the employee's unemployment compensation and 60% of his weekly pay. Once the employee's unemployment compensation is depleted, Westinghouse continues to pay 60% of the employee's weekly salary until such time as the Total Maximum Sum is depleted or twelve months elapse. (*Id.*, pp. 3–4.) Under Option C the employee receives the balance of his Total Maximum Sum twelve months after the plant closing. (*Id.*, p. 4).

Each of the plaintiffs in this action, therefore, is at least 55 years of age, with at least ten years of service with Westinghouse and without rights or opportunities at other Westinghouse facilities. These plaintiffs all receive some form of retirement benefits and, because of their eligibility for early retirement, did not receive independent LIB benefits as a result of the Belleville plant closing.

At all times relevant to this action Westinghouse maintained at its headquarters in Pittsburgh, Pennsylvania, an office of legal counsel with responsibility, *inter alia,* to review employee benefit plans to assure their compliance with applicable labor laws and regulations. The Westinghouse office of legal counsel, at least during the period in question, included several attorneys and support personnel, maintained a library replete with labor law publications and materials and maintained an affiliation with several commercial services that provide updated information on legal developments in the field of labor law. (Duffy Supp. Aff., filed July 9, 1986, Saltman Testimony in *Westinghouse* (E.D.Pa.).) The Westinghouse office of legal counsel specifically reviewed the various employee benefit plans, including the retirement and LIB plans at issue herein, to assure their compliance with the ADEA and other laws. (Plaintiff's Brief in Support of Motion for Summary Judgment, p. 13 (quoting deposition testimony of Saltman).)

By letter, dated January 7, 1977, Westinghouse publicly announced it would be closing its Belleville plant in April, 1977. (Duffy Aff., filed July 9, 1986, Ex. A.) There is deposition testimony to the effect

---

5. Entitlement to either early or selected retirement is subject to the qualifications that the employee not be offered employment at another Westinghouse facility and not have contractual rights at another Westinghouse facility. (*Id.* §§ II. C and D.)

6. This exhibit to the Weaver affidavit is limited to the summary of the LIB plan. Presumably the summary accurately reflects the actual terms of the plan; its accuracy has not been questioned.

that Westinghouse announced the exact closing date, April 1, 1977, at public meetings held on January 7, 1977 and by notices posted thereafter on bulletin boards located in the plant. (See Deposition testimony cited to in Defendant's Brief in Opposition to Motion for Summary Judgment, pgs. 19–21 nn. 46–52.) Certainly by letter, dated March 8, 1977, Westinghouse made known to its employees the plant would close on April 1, 1977. (Duffy Aff., filed July 9, 1986, Ex. B.)

Beginning in January, 1977, the Westinghouse supervisor responsible for employee benefits ("Rodrigues") conducted individual counselling sessions with each of the plaintiffs herein. (Duffy Aff., filed July 9, 1986, Rodrigues Deposition, p. 33.)[7] The record is not clear exactly what Rodrigues told each of the employees. Excerpts from a deposition of Rodrigues, conducted on May 14, 1985, indicate Rodrigues counselled the employees as to the retirement benefits to which they were entitled. The deposition testimony further establishes that it was Rodrigues' "understanding that as a part of [her] counselling that employees who were eligible for ... retirement would not be eligible to receive LIB." (Duffy Supp. Aff., filed July 9, 1986, Rodrigues Deposition pp. 14–16.) Each of the plaintiffs in this case was counselled by Rodrigues, and signed "pension papers", indicating the employee's preference as to his retirement benefits, by March 16, 1977. (Duffy Aff., filed July 9, 1986, ¶ 9.) The Belleville plant was closed on April 1, 1977 (Joint Stipulation ¶ 1) and the plaintiffs herein began receiving their retirement benefits at that time.

## III. *Discussion*

To prevail on a motion for summary judgment, a party must establish that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As elaborated by the Supreme Court:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The district court's inquiry is to determine whether "there are any genuine factual issues that properly can be resolved by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

The EEOC's summary judgment motion raises three issues before the Court: (1) whether the EEOC's action is time-barred by the relevant statute of limitation; (2) whether, under principles of *res judicata*, the decision in *Westinghouse* (E.D.Pa.) precludes this Court from entertaining relitigation of issues previously decided in that case; and (3) whether Westinghouse has come forward with facts to support its claimed defenses under the ADEA. Because resolution of the statute of limitations issue could obviate deciding the second two issues, the Court exercises its discretion to hold those issues in abeyance pending resolution of the statute of limitations issue.

The statute of limitations issue breaks down into two distinct inquiries. The first question is whether Westinghouse's alleged violation of the ADEA is "willful," thereby triggering a three year, rather than two year, statute of limitations. The second question is the precise date upon which the cause of action accrued.

---

**7.** One of the named plaintiffs was ineligible for   any severance benefits (Joint Stipulation, p. 6.)

## 1. *Willfulness*

■ The ADEA incorporates by reference the statutes of limitations specified in the Portal-to-Portal Act of 1947. 29 U.S.C. § 626(e). For purposes of the case at bar, the Portal-to-Portal Act provides a three year statute of limitations in cases of "willful" violations, and a two year statute of limitations for all other violations. 29 U.S.C. § 255(a). Neither the ADEA nor the Portal-to-Portal Act elaborates upon the meaning of the term "willful."

At the time the parties submitted their briefs on this motion, courts had developed three distinct interpretations of willfulness, none of which is binding on this Court. In *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139 (5th Cir.1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972), the Fifth Circuit determined that an employer willfully violated the Fair Labor Standards Act if the employer knew the Act "was in the picture." *Id.* at 1142.[8] In *Wehr v. Burroughs Corp.,* 619 F.2d 276 (3d Cir.1980), *overruled by, Transworld Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), the Third Circuit had ruled that for purposes of the liquidated damages provision of the ADEA,[9] an employer willfully violated the ADEA if the violation "was voluntary and not accidental, mistaken, or inadvertant." *Wehr,* 619 F.2d at 283.[10] Finally, in *Thurston, supra,* the Supreme Court ruled in the context of the ADEA's liquidated damages provision, an employer's violation is willful "if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " *Thurston,* 469 U.S. at 126, 105 S.Ct. at 624 (quoting Court of Appeals language).[11]

After the parties had filed their briefs on this motion, the Third Circuit, in *Brock v.*

*Richland Shoe Co.,* 799 F.2d 80 (3d Cir. 1986), expressly ruled that for purposes of the Portal-to-Portal Act's statute of limitations provision, an employer's labor law violation is willful "if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited." *Id.* at 81.

In *Richland Shoe,* the Department of Labor brought an action on behalf of seven mechanics against their employer, the Richland Shoe Company, charging the Company with violations of overtime and recordkeeping provisions of the Fair Labor Standards Act ("FLSA"). The same Portal-to-Portal Act statute of limitations provision at issue in this case is expressly applicable to the FLSA. 29 U.S.C. § 255(a). One issue in the case involved whether the employer's violations of the FLSA were willful, thereby triggering the three year statute of limitations. The District Court had applied the *Jiffy June* "in the picture" test and determined that because an officer of the employer had testified at deposition he was aware the FLSA applied to overtime systems such as the one used by the Richland Shoe Company, the three year statute of limitations applied.

The Third Circuit's reversal was straightforward. It ruled that the *Jiffy June* definition "is contrary to the plain meaning of the FLSA," and that nothing in the legislative history of the Portal-to-Portal Act supported the *Jiffy June* court's extraordinarily broad interpretation of willfulness. *Id.* at 82–3. Indeed, the Third Circuit pointed out that "the *Jiffy June* standard would frustrate legislative intent: because the standard is so lax that virtually any employer could be found to have acted willfully, the two-tiered scheme of liability that Congress evidently intended to implement would be eviscerated." *Id.* at 83.

---

**8.** The Fair Labor Standards Act is expressly governed by the Portal-to-Portal Act's statute of limitations. 29 U.S.C. § 255(a).

**9.** 29 U.S.C. § 626(b).

**10.** This definition of willfulness was adopted in the statute of limitations context in *EEOC v.*

*Home Insurance Co.,* 553 F.Supp. 704 (S.D.N.Y. 1982).

**11.** This definition of willfulness was applied in the statute of limitations context in *Slenkamp v. Borough of Brentwood,* 603 F.Supp. 1298 (W.D. Pa.1985).

Without considering the *Wehr* definition of a willful violation as one that is "voluntary and not accidental, mistaken or inadvertent," *Wehr*, 619 F.2d at 283, the Third Circuit embraced as "persuasive precedent" the "knew or showed reckless disregard" standard adopted by the Supreme Court in *Thurston. Richland Shoe*, 799 F.2d at 83. The *Thurston* opinion had expressly noted it did not address the question of willfulness in the statute of limitations context.[12] Nonetheless, the Third Circuit in *Richland Shoe* found no basis for cloaking willful with different meanings in the liquidated damages and statute of limitations contexts.

Several courts have attempted to distinguish *Thurston,* as a case involving liquidated damages, and hence clearly punitive measures enacted by Congress, from cases involving "non-punitive statute of limitations" extensions. *See Donovan v. Bel-Loc Diner, Inc.,* 780 F.2d 1113, 1117 (4th Cir.1985); *Secretary of Labor v. Daylight Dairy Products, Inc.,* 779 F.2d 784, 789 (1st Cir.1985). The Third Circuit expressly refuted these cases and their reasoning:

> We disagree with the First Circuit [in *Daylight Dairy Products*] because increasing an employer's liability based on his willfulness is essentially punitive.... Thus, the extension of liability is clearly based on Congress' perception that willful violations are more culpable than negligent ones. The extension is therefore a punitive measure, and no different in this regard from the double damages provision considered in *Thurston.*

*Richland Shoe,* 799 F.2d at 84. The issue in this case, therefore, boils down to whether Westinghouse exhibited reckless disregard for whether its policy of not providing LIB benefits to employees eligible for early or selected retirement was in violation of the ADEA.

The EEOC urges Westinghouse's position that its severence policy conforms to the requirements of the ADEA, and in par-

ticular Westinghouse's behavior since the initiation of this action by the Department of Labor in 1977, exhibits reckless disregard for whether Westinghouse's severance policies violate the ADEA. In essence, the EEOC argues that Westinghouse's disagreement with the EEOC over the ADEA's applicability to the case at bar constitutes reckless disregard for the ADEA. To bolster this conclusory position, the EEOC points out that (1) Westinghouse failed to seek an opinion letter from the EEOC that the Westinghouse severance policy conformed with the ADEA's requirements and (2) Westinghouse refused to enter into negotiation or conciliation efforts with the EEOC.

Westinghouse counters that based upon the uncontested factual record before the Court and controlling legal principles, Westinghouse's position cannot amount to reckless disregard for whether its severance policies violated the ADEA. As a preliminary point, Westinghouse notes its severance policies were not created unilaterally by Westinghouse in an isolated vacuum; the policies now under attack resulted from negotiations with the employees' union. The argument continues that if the alleged violations are willful, it would appear both Westinghouse and the union exhibited reckless disregard for the provisions of the ADEA. Be that as it may, Westinghouse points out the record indicates its office of legal counsel, with access to a current and specialized labor law library and trained to review agreements with employees to assure compliance with state and Federal labor laws, actually reviewed the severance policy at issue. Upon such review, Westinghouse claims, the conclusion that its severance policy complied with existing law cannot constitute reckless disregard for the law. Having reached this good faith and not unreasonable position, Westinghouse argues, its refusal to negotiate or enter into conciliation efforts with the EEOC was entirely appropriate.[13]

---

**12.** *See Thurston,* 469 U.S. at 128 n. 21, 105 S.Ct. at 625 n. 21.

**13.** Westinghouse notes, in rebuttal to the EEOC, that its failure to seek an EEOC opinion letter about its severance policy, when the EEOC's

A review of the case law reveals that relatively few courts have analyzed the "reckless disregard" standard in this or analogous situations. In *Thurston*, the Supreme Court offered some guidance as to a factual scenario *not* amounting to reckless disregard for the law. The Supreme Court noted that "[i]n an attempt to bring its retirement policy into compliance with the ADEA, while at the same time observing the terms of the collective bargaining agreement, TWA sought legal advice and consulted with the Union." *Thurston,* 469 U.S. at 130, 105 S.Ct. at 626. Evidence of such actions, according to the Supreme Court, "makes clear that TWA officials acted reasonably and in good faith in attempting to determine whether their plan would violate the ADEA." *Id.* at 129, 105 S.Ct. at 626.

Other courts have ruled to similar effect. *See, e.g., Slider v. National Rolling Mills, Inc.,* No. 83–5929, slip op. (E.D.Pa. June 9, 1986) [Available on WESTLAW, DCTU database] (that employer was aware ADEA prohibited discrimination on basis of age yet failed to consult counsel as to whether planned layoffs would violate ADEA amounted to reckless disregard); *Gorman v. Continental Can Co.,* No. 76–C–908, slip op. (N.D.Ill. March 25, 1986) [Available on WESTLAW, DCTU database] (where employer knew of substantial question raised by FLSA and failed to make adequate legal and factual inquiry as to whether certain employees were exempt from FLSA, such constituted reckless disregard); *Jennings v. Lenox Hill Hospital,* No. 84–1081, slip op. (S.D.N.Y. January 22, 1986) [Available on WESTLAW, DCTU database] (where Hospital failed to consult legal counsel as to propriety of reorganization plan under ADEA, and concealed basis for eliminating plaintiff's job, such amounted to bad faith and reckless disregard). *See also Whitfield v. City of Knoxville,* 756 F.2d 455, 463–64 (6th Cir.1985) (where case law is unsettled, defendants do not act in reckless

disregard of law by relying in good faith on minority district court opinion).

Applying the law established by these cases to the settled facts on the record before this Court, I conclude Westinghouse did not act with reckless disregard for the provisions of the ADEA. The EEOC essentially argues that because Westinghouse disagrees with the EEOC whether its severance policies are violative of the ADEA, Westinghouse is exhibiting reckless disregard for the mandates of the ADEA. Perhaps if the ADEA violation alleged in this case were more obvious than it appears to be, the EEOC's argument would be persuasive. Yet where Westinghouse's position does not appear to be patently unreasonable or otherwise maintained in bad faith, the claim that Westinghouse is acting with reckless disregard is untenable. As Westinghouse points out, numerous employers, including the United States government, maintained severance policies similar to the Westinghouse policy at the time this action was initiated. (Defendants' Brief in Opposition to Summary Judgment, pp. 57–60.) Although such evidence cannot alter the underlying legality or illegality of the Westinghouse policy, it can and does suggest the reasonableness of Westinghouse's position that its severance policy is not violative of the ADEA. Accordingly, Westinghouse's alleged violation of the ADEA was not willful, and the Portal-to-Portal Act's two year statute of limitations governs in this action.

### 2. *Accrual of Cause of Action*

The relevant statute of limitations being two years, the date upon which the Westinghouse employees' cause of action accrued becomes of critical importance to this case. The EEOC proposes several alternative dates: April 1, 1978, the date the balance of LIB payments due to early retirees choosing Option C of the LIB plan were to be paid; May 30, 1979, the date Westinghouse formally notified the Department of

---

opinion letter process was virtually non-existent (Duffy Supp.Aff., filed July 9, 1986, Saltman Testimony at 20), was not unreasonable and

cannot amount to reckless disregard for the ADEA.

Labor it did not believe its severance policies violated the ADEA; or no date, because under a broad theory of continuing violations in discrimination cases, Westinghouse's continued implementation of its severance policies at other Westinghouse plants around the nation has prevented the statute of limitations from running at any single plant. Each of these proposals renders timely the March 28, 1980 filing date of the complaint.

Westinghouse proposes several other alternative dates: January 2, 1977, the date the employees allegedly were informed officially of the April, 1977 plant closing; March 16, 1977, the date the last of the plaintiff employees was formally counselled about retirement benefits; or April 1, 1977, the date of the plant closing. Each of these dates renders untimely the filing of the complaint.

The determination of the accrual date in this action must begin with an examination of the Supreme Court's decision in *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). *Ricks,* a Title VII discrimination action, was brought by a professor challenging the Delaware State College Board of Trustees' decision denying him tenure. Ricks was informed on June 26, 1974 of the Board's decision denying him tenure. At that time, Ricks accepted an offer of a one year "terminal" contract that was to expire on June 30, 1975. Ricks filed his Title VII action against the College in April, 1975, a date clearly untimely if June 26, 1974 was the date the cause of action accrued, given Title VII's requirement that actions generally be filed within 180 days of the discriminatory action. 42 U.S.C. § 2000e–5(e). In ruling that Ricks' cause of action accrued on June 26, 1974, the date the Board of Trustees formally notified Ricks of its decision denying him tenure, the Supreme Court carefully distinguished between the date the alleged discrimination was made known to Ricks and the date or dates the effects of the alleged discrimination arose:

In sum, the only alleged discrimination occurred—and the filing limitations period therefore commenced—at the time the tenure decision was made and communicated to Ricks. That is so even though one of the *effects* of the denial of tenure—the eventual loss of a teaching position—did not occur until later.

*Id.* at 258, 101 S.Ct. at 625 (emphasis in original).

In *Westinghouse* (3d Cir.), the Third Circuit had an opportunity to review the applicability of *Ricks* to the facts of this case; several of the Third Circuit's observations provide useful guidance at this juncture. The Third Circuit pointed out that "[e]ach denial of LIB to each of the 65 employees constituted a specific act which was part of Westinghouse's alleged continuing policy of discrimination on the basis of age. Thus, this act does not involve a discrete, isolated act such as the denial of tenure to one professor." *Westinghouse* (3d Cir.), 725 F.2d at 219. The Third Circuit implied Westinghouse maintained an allegedly discriminatory policy continuing up until the last of the affected employees was notified that the allegedly discriminatory Westinghouse policy would be applied to him. Based on the record before the Third Circuit in *Westinghouse* (3d Cir.), a factual dispute existed whether the plaintiffs were aware, prior to the closing of the plant, that they were ineligible for LIB benefits. *Id.* at 220. Whether or not the plaintiffs had been given clear notice of their ineligibility for LIB benefits, however, the Third Circuit went on to suggest that "an employee would still not have standing to bring an action until he at least was eligible to apply for LIB at the time of the plant closing." *Id.* Thus, the Third Circuit has suggested that regardless of the notice given to employees by Westinghouse, under principles of the doctrine of standing the plaintiffs' collective cause of action could not have accrued until the plant closing date.[14]

14. The Third Circuit's suggestion that the affected employees might not have had standing to

assert their ADEA claim until the plant actually closed, poses an interesting question under

■ The record now before the Court indicates that all of the plaintiff employees in this action were counselled by an officer of Westinghouse about retirement benefits by March 16, 1977. The record suggests, but does not clearly establish, however, that the employees were counselled that they would be eligible only for early retirement, and not for LIB benefits. The record is also unclear whether all of the plaintiff employees were union members, or otherwise participated in, or were aware of, the early retirement program, and were thereby subjected to the alleged age-based discrimination. Because these issues of material fact are unsettled, the Court cannot enter summary judgment as to the date the last adversely affected employee was notified Westinghouse's allegedly discriminatory policy would be applied to him, thereby commencing the statute of limitations period. Counsel are invited to submit appropriate documentation to resolve the question of when this cause of action accrued.

■ Two points raised by the EEOC bear addressing. The EEOC has urged the Court to adopt a broad interpretation of the "continuing violation theory" to toll the statute of limitations. That theory, applicable in discrimination lawsuits in which the alleged discriminatory action is ongoing by nature rather than a distinct or isolated event, tolls the running of the statute of limitations until the occurrence of the last instance of the allegedly discriminatory activity. *See, e.g., Erdmann v. Bd. of Education,* 541 F.Supp. 388 (D.N.J.1982). The EEOC argues that because Westinghouse continues to implement its allegedly discriminatory severance policy in its plants around the nation, the statute of limitations has not yet commenced to run. If the complaint in this action had been brought on behalf of all similarly situated Westing-

house employees nationwide, the EEOC's position might be plausible. Where, as here, the complaint is brought on behalf of employees laid off as a result of the Belleville plant closing, the continuing violation theory cannot serve to extend the accrual date for these plaintiffs' cause of action beyond the date all of these plaintiffs knew the policy would be applied to them. Although the effects of the discriminatory policy may have been felt by the Westinghouse employees beyond that date, the allegedly discriminatory practice itself simply cannot be said to have existed, vis-a-vis the Belleville employees, once the Belleville plant was closed.

■ The EEOC further suggests that the plaintiffs' cause of action in this case could not have accrued until April 1, 1978, the date employees selecting Option C of the LIB plan would have received the balance of their Total Maximum Sums. Although the record before the Court is unclear as to the precise mechanics of Option C, even assuming most favorably to the EEOC that under Option C employees would not receive any LIB benefits until twelve months after the date of the plant closing, the EEOC's position is unacceptable. The EEOC's argument flies in the face of the *Ricks* holding that for purposes of determining the accrual date of a discrimination cause of action, the proper focus is on the act of discrimination itself, and the date the discriminatory action is made known to the plaintiff, rather than on the date the effects of the discrimination are felt. The date Westinghouse's allegedly discriminatory policy was made known to the plaintiff employees is entirely distinct from whatever date the inevitable effects of the Westinghouse policy may have been felt by the employees.

*Ricks.* The Third Circuit appears to suggest the *Ricks* holding that a discrimination cause of action accrues once the discriminatory action has occurred and been communicated to the victim, rather than when the discriminatory action's effects are suffered, conflicts with traditional notions of standing. The parties herein have not addressed the problem and its resolution is not determinative in this case. Even assuming the employees lacked standing to sue until the Belleville plant closed and they became eligible to apply for LIB benefits, the action would still not be timely filed.

### Conclusion

Because the record before the Court establishes Westinghouse did not act in reckless disregard for whether its severance policies violate the ADEA, the Portal-to-Portal Act's two year statute of limitations governs this action. Because the record does not establish the date all of the plaintiff employees knew they would not be eligible for LIB benefits, summary judgment cannot be entered on that point.

Counsel for Westinghouse is directed to submit an appropriate order.