**Sheila Ann GLENN, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**Civ. A. No. CV–83–V–5777–NE.**

United States District Court,
N.D. Alabama,
Northeastern Division.

July 10, 1986.

On Motion for Attorney Fees
Feb. 4, 1987.

**920**

James H. Richardson, Gabrielle U. Wehl, Bell, Richardson, Herrington, Sparkman and Shepard, P.A., Huntsville, Ala., Larry Menefee, Blachsher, Menefee & Stein, P.A., Birmingham, Ala., for plaintiffs.

Barry V. Frederick, Charles A. Powell, III, Birmingham, Ala., for defendant.

## OPINION AND ORDER

VANCE, Circuit Judge, Sitting by Designation.

The factual and legal statements incorporated in this opinion constitute the court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a). In this case plaintiffs, Sheila Ann Glenn ("Glenn"), Patricia J. Johns ("Johns"), and Robbie Nugent ("Nugent"), claim that the defendant, General Motors Corporation ("GM"), violated the Equal Pay Act, 29 U.S.C. § 206(d).[1]

The three plaintiffs are employed in the Materials Management Department (previously Tool Stores Department) of the Saginaw Division of GM in three different plants near Athens, Alabama. The plaintiffs currently work in the positions of Materials Management Expediter and Materials Follow-Up Clerk, previously designated Follow-Up and Associate Follow-Up Tool and Die respectively. A Follow-Up basically insures that adequate supplies of tools and operating materials are on hand in the GM plants to meet the minimum levels necessary to keep the plants running. A portion of the information used in the job is computer-generated. Normally, each plant has three Follow-Ups, but at times GM has used less than three. Up to the time of this suit, four women, including plaintiffs, have worked in the Follow-Up position—all other Follow-Ups have been men.

### The Plaintiffs

Plaintiff Nugent was hired by GM "off the street" (from outside GM) in 1975 as a level 4 Associate Follow-Up Tool and Die, with salary of $600.00 per month. She was employed in Plant 21. Nugent was the first person hired by GM in a Follow-Up capacity. Nugent was told by GM that she was starting at the bottom of the salary scale but that in six months she would be evaluated on her ability. Nugent became a level 5 Follow-Up with no change in job duties during the second quarter of 1978 at a base monthly salary of $1,100.00. During 1984, her job title was changed to Mate-

---

1. 29 U.S.C. § 206(d)(1) provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

rials Management Expediter. In 1985, her base monthly salary was $2,385.00. At time of trial, her base monthly salary was $2,505.00, effective January 1986.

Plaintiff Glenn was hired "off the street" by GM in September 1977 as a salaried employee in Plant 21. Glenn was hired into a level 3 stenographer position with a base salary of $755.00 per month. In February 1981 Glenn transferred from the position of stenographer, at a base salary of $1,310.40, to the position of level 4 Associate Follow-Up Tool and Die in Plant 23. Glenn's base salary, after transfer, was $1,441.44 per month. In 1984, Glenn's job title was changed to Materials Follow-Up Clerk. In 1985 her base salary was $2,370.00 per month. At time of trial, her base monthly salary was $2,550.00, effective January 1986.

Plaintiff Johns was hired "off the street" by GM in October 1978 as a salaried employee in the position of secretary to the Plant 22 superintendent. In February 1981 Johns became a level 4 Associate Follow-Up Tool and Die in Plant 22 with a base monthly salary of $1,316.64. Johns currently holds the title of Materials Follow-Up Clerk, and her 1985 base salary was $2,271.00 per month. Her monthly salary at time of trial was $2,405.00, effective January 1986.

### The Plaintiffs' Male Counterparts

In September 1975, Richard Tanley transferred from the hourly tool crib job at GM to the position of Associate Follow-Up Tool and Die alongside plaintiff Nugent in Plant 21, at a monthly base salary of $660.00. In April 1978 Tanley was given the level 6 position of supervisor, Tool Stores Department, Plant 22. In 1985 he was the Receiving and Inspection Supervisor. Tanley's job duties did not change when he was promoted from Associate Follow-Up to Follow-Up.

Stephen Downs was hired as an hourly employee at the Saginaw plant in January 1976. His job position was skilled trades— 70 Rate, however, he held the position of forklift driver. His base monthly equivalent salary was $932.35. Downs transfer-red from hourly to salaried employment, taking the position of Associate Follow-Up Tool and Die in February 1977. He worked in Plant 21 alongside Robbie Nugent. His monthly base salary was $975.00, which increased to $1,075.00 in April 1977. Nugent's monthly base salary for the same period was $878.94. In April 1978 Downs became a Follow-Up, with a base monthly salary of $1,250.00. His job duties did not change. Plaintiff Nugent's base monthly salary at that time was $1,100.00. In 1985 Downs' job title was changed to Materials Management Expediter. In May 1985 he took the position of Senior Materials Management Expediter, a level 6 position. His job duties did not change. In 1985 his monthly base salary was $2,775.00; Plaintiff Nugent's was $2,385.00.

Steven D. Greenlee was hired in April 1979 as an Associate Follow-Up Tool and Die for Plant 22. His monthly base salary was $1,175.00. Greenlee remained an Associate Follow-Up until he was laid off during June 1980. At the time of his layoff, his base monthly salary was $1,545.40. Greenlee was recalled during January 1981 to the same position he had previously held, at a base monthly salary of $1,545.54. During June 1981 Greenlee assumed a level 5 position of supervisor-in-training, and in September 1981 he became a production supervisor. In June 1985 Greenlee held the position of production supervisor.

Harold Wales was hired by GM during June 1977 at an hourly rate as a job setter —30 Rate. He received a monthly equivalent wage of $1,216.57. In May 1978 he transferred to the salaried position of Follow-Up Tool and Die alongside plaintiff Nugent in Plant 21 at a monthly base salary of $1,230.00. One month later he returned to an hourly position. In January 1981 Wales left his position of machine operator —20 Rate, with a monthly equivalent wage of $1,608.22, and resumed the position of Follow-Up Tool and Die in Plant 21, with a monthly base salary of $1,608.22. Harold Wales currently holds the position of Materials Management Expediter. His job duties have not changed. In 1985 his base monthly salary was $2,485.00.

Robert Stephenson was hired by GM in March 1978 as an hourly employee, machine operator—20 Rate; however, in fact he was a crib attendant. His monthly equivalent pay was $1,171.51. Stephenson testified he applied for a salaried Tool Stores position but was hired as an hourly tool crib attendant. During September 1978 he transferred to the salaried position of Associate Follow-Up Tool and Die in Plant 22 at a monthly base salary of $1,220.00. Stephenson held this position until June 1980, at which time he returned to an hourly position as a tool crib attendant, and was paid $1,293.44 per month. He remained an hourly employee until January 1981, at which time he transferred to the position of Associate Follow-Up in Plant 22, with a base monthly salary of $1,564.00. Sometime between September 1982 and September 1983, Stephenson took the level 5 position of Follow-Up. In September 1984 his job title changed to Materials Management Expediter, fifth level. His base monthly salary increased from $1,752.96 to $1,875.66, but his job duties remained the same. GM admitted that Bobby Stephenson was transferred to the position of Associate Tool and Die Follow-Up in 1978 at GM's Plant 22 at a higher base salary than Robbie Nugent was being paid in Plant 21 at the time of Stephenson's transfer.

Billy White was hired by GM in December 1978 as an hourly employee. He held the position of machine operator—20 Rate, with a monthly equivalent pay of $1,608.22. In April 1981 he took the position of Associate Follow-Up Tool and Die in Plant 23, with a monthly base salary of $1,656.46. In 1984 his job title was changed from Associate Follow-Up to Materials Follow-Up Clerk, and during May 1985, he was given a level 5 position as a Materials Management Expediter. White's job duties remained the same. His base salary in 1985 was $2,600.00. White was hired nearest in time to plaintiffs Glenn and Johns.

Jerry Pepper became an Associate Follow-Up in July 1981 at a monthly salary of $1,656.00. Jerry Pepper's job title was changed to Materials Follow-Up Clerk in 1984. In June 1985 Pepper became a level 5 Materials Management Expediter. Despite the change in job, Pepper's duties have remained the same. His 1985 base monthly salary was $2,740.00.

### The Pay Disparity

Through 1985 all three plaintiffs earned less than all of their male counterparts in the Follow-Up position in the Tool Stores Department. In fact, the most highly-paid plaintiff made less through 1985 than the lowest-paid man. Plaintiff Nugent was hired as an Associate Follow-Up two months before Richard Tanley was hired in the same capacity, yet Tanley's monthly salary was $60 higher. Plaintiffs Johns and Glenn were hired as Associate Follow-Ups two months before Billy White, yet White's starting Associate Follow-Up salary was $215 per month higher than Glenn's and $336 per month higher than Johns'.

Plaintiffs Glenn, Johns and Nugent each received an "inequity adjustment" shortly after plaintiffs Johns and Glenn filed their EEOC charges. No one else in the Tool Stores Department received an "inequity adjustment." In determining whether to give an "inequity adjustment" to salary, the GM salaried personnel administration looks at the employee's salary in relation to a new hire's salary, the employee's performance and length of service. In August 1983 plaintiff Glenn received an "inequity adjustment" of $150.56. Defendant's stated reason for the adjustment was "due to review of salary structures of Tool Stores Department." In August 1983 plaintiff Johns received an "inequity increase" in the amount of $142.82. The defendant's stated reason for the adjustment was "due to review of salary structure of Tool Stores Department." Plaintiff Nugent was the only employee in her department to get an inequity adjustment. The "inequity adjustment," made in August 1983, was in the amount of $159.74.

GM quibbles about whether the Follow-Up job handled by the three women plaintiffs and the men are comparable, and attempts to distinguish them on the basis of specific items handled by Follow-Ups. The function of the Tool Stores Department is

generally to provide for all non-productive material that is used within the plants.[2] It involves the management of inventories and maintenance of the plants to keep the plants running. It also includes management of janitorial supplies. Specific functions include ordering non-productive material for the three Alabama plants, specifying order quantities, maintaining tooling crib stock levels, and making special or "emergency" buys. The positions held by plaintiffs and their male counterparts in October 1983 were "Follow-Up Tool and Die" and "Associate Follow-Up Tool and Die." These titles were changed in September 1984 to "Materials Management Expediter," "Materials Follow-Up Clerk," and "Senior Materials Management Expediter," although the job requirements and functions remained the same under all five of these titles. Except for six months in 1983 when all Tool Stores Departments for the three plants were consolidated, each plant has had a separate Tool Stores Department. A Follow-Up and Associate Follow-Up in Tool Stores orders and disburses non-productive materials, confirms orders, processes emergency orders, and processes daily paper work. They set up new items of inventory, and they deal with outside salesmen.

GM contends that the male Follow-Ups who handle items ordered from blueprints need different skills than those Follow-Ups, including the plaintiffs, who do not. The court finds that for all purposes material to this case the positions of Blueprint Follow-Up and Follow-Up are identical. The court notes that GM has never treated Follow-Ups differently for compensation purposes on the basis of items handled. When plaintiff Nugent handled blueprint items, for example, she still made less than a male Follow-Up who did not. Some of the men handling blueprint items currently make less money than other men who do not work with blueprint items. The only cur-rent Follow-Up who has had college training in working with blueprints is plaintiff Johns, and she does not handle blueprint items at present.

█ The court does not doubt that increased familiarity with blueprint items may enable the Follow-Ups who handle them to work with them in a more meaningful way, but GM does not require formal blueprint training. The court does not credit any evidence presented by GM indicating that Blueprint Follow-Ups actually interpret blueprints. GM has skilled "troubleshooters" and engineers present to carry on this function, and the court finds it highly unlikely that GM would rely on unskilled Follow-Ups to interpret blueprints to its suppliers when the continued viability of the plants is at stake. The Blueprint Follow-Ups provide the vendors with only routine information that can be obtained from the blueprints without actually interpreting them.

GM attempts to justify the pay disparity between the male and female Follow-Ups by emphasizing the route by which each Follow-Up progressed to the Follow-Up position. GM contends that the male Follow-Ups transferred into their positions from higher-paid hourly jobs within GM, and that GM maintained this higher level of pay to encourage them to make the move to a salaried Follow-Up position. The higher hourly salaries were the result of collective bargaining which did not affect the salaried positions. The women plaintiffs, GM argues, came from lower-paid *salaried* positions within GM. GM asserts that their salary policies are gender-neutral, and are uniformly applied in determining entry salaries for Follow-Ups.

█ GM's asserted policy to encourage employees to transfer from hourly positions to salaried positions by maintaining the same rate of pay after transfer is not in

---

**2.** "Non-productive" materials are materials required to operate the plant and maintain machinery to build the parts for a GM automobile. Such materials include, but are not limited to: bearings; chains; seals; power transmission parts (such as sprockets, couplings, reducers and gear boxes); electrical parts; blueprint tool-ing; stationery items (such as paper, forms, tags, pencils); spare parts; cutting tools; hand tools; tool holders; abrasives; grinding wheels; maintenance and tool steel oils; chemicals; lubricants; nuts, bolts, and screws; charts; springs; janitorial supplies and other miscellaneous supplies.

writing. GM maintains a written salaried administration plan or manual, commonly referred to as the "black book," which contains no mention of the "transfer policy." GM also maintains a written merit plan, to determine certain pay increases, which contains no reference to the "transfer policy."

The court finds that this so-called salary "policy" is in fact not a policy at all, but merely one aspect of a practice. In practice GM simply pays Follow-Ups what it takes to induce them to accept the employment. The court notes that historically companies may and do hire women at lower starting salaries. The court is thus unconvinced of GM's attempted justification for the pay disparity. The three female plaintiffs are being paid less money than their male counterparts for equal work without justification.

■ In order for plaintiffs to establish a prima facie. case under the Equal Pay Act, they must show "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skills, effort, and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Morgado v. Birmingham-Jefferson County Civil Defense Corps,* 706 F.2d 1184, 1187–88 (11th Cir. 1983), *cert. denied,* 464 U.S. 1045, 104 S.Ct. 715, 79 L.Ed.2d 178 (1984). The Equal Pay Act "also establishes four exceptions— three specific and one a general catchall provision—where different payment to employees of opposite sexes 'is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.' " *Corning,* 417 U.S. at 196, 94 S.Ct. at 2229. The court is convinced that plaintiffs have carried their burden of establishing a prima facie case of liability under the Equal Pay Act, and that the defendant GM has failed to establish any of the Act's four exceptions justifying a pay disparity.[3]

■ On the issue of damages, the court must determine the applicable statute of limitations for this Equal Pay Act action. 29 U.S.C. § 255(a) provides that such actions "may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." The court in *Brock v. Georgia Southwestern College,* 765 F.2d 1026 (11th Cir.1985), provided these guidelines for determining when a "willful" violation has occurred necessitating the application of the three-year statute of limitations:

[A] violation is willful if the employer knows or has reason to know that his or her conduct is governed by the [Equal Pay] Act. *Brennan v. Heard,* 491 F.2d 1 (5th Cir.1974). An employer need not proceed with knowledge that his or her actions are contrary to the Act in order for willfulness to be found. *Id.* An action is "willful" if the employer knew that the Act was "in the picture" regardless of the defendant's good faith. *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). *See also Marshall v. A & M Consolidated Independent School District,* 605 F.2d 186, 190–91 (5th Cir.1979) (actual awareness of the law is unnecessary to establish willfulness; knowledge is imputed).

*Brock,* 765 F.2d at 1039.[4] Clearly, in this case GM knew more than that the Equal

---

**3.** Plaintiffs also alleged a claim of retaliation against GM. Plaintiffs contended at trial that various actions taken by GM constituted improper acts in retaliation for plaintiffs having brought this suit. The court finds a paucity of evidence to support a claim of retaliation and therefore denies the claim.

**4.** The court notes that the Supreme Court's decision in *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), is inapposite. In *TWA* the Court defined a violation of the Age Discrimination in Employment Act as "willful" if "the employer either knew or showed reckless disregard for the mat-

Pay Act was merely "in the picture." GM was aware at all times material to this litigation that the Equal Pay Act governed their conduct concerning plaintiffs. In fact GM has admitted that it knew about the Equal Pay Act three years prior to the date of the filing of plaintiffs' lawsuit (October 1983). The court will therefore apply a three-year statute of limitations in determining the damage award for plaintiffs.

Plaintiffs further contend that they are entitled to liquidated damages pursuant to 29 U.S.C. § 216(b) which provides as follows:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216. Section 260, however, provides that "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages...." 29 U.S.C. § 260. For this court to exercise its discretion, GM "must show that [its] failure was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose liquidated damages upon [it]." *Hays v. Republic Steel Corp.*, 531 F.2d 1307, 1309 n. 3 (5th Cir.1976). This court is convinced that GM's violation of the Equal Pay Act, while "willful" as that term is defined by this circuit in this context, was in good faith and predicated upon reasonable grounds. As stated in *Brock*, an act

may be " 'willful' if the employer knew that the [Equal Pay] Act was 'in the picture' regardless of the defendant's good faith." *Brock*, 765 F.2d at 1039. GM knew that their conduct was governed by the Equal Pay Act, but created the pay disparity concerning plaintiffs in good faith believing the disparity justified on the basis of their hourly transfer pay "policy." The court, therefore, will not award liquidated damages.

Because the parties have not fully presented their respective contentions concerning the computation of damages, the court directs the plaintiffs to submit a memorandum within twenty days from this date addressing in itemized detail the precise method of computation of plaintiffs' damages and presenting their authority for the award of prejudgment interest. Defendant shall thereafter have fifteen days for the filing of a counter-memorandum. The parties should be mindful of the court's ruling that liquidated damages will not be awarded and that the three-year statute of limitations applies. The issue of the award of attorney's fees previously was reserved in this case for future consideration, and the court further directs that within twenty days following the date of this opinion plaintiffs shall submit their application for attorney's fees with supporting memorandum. If defendant desires to respond to plaintiffs' attorney's fees memorandum it may do so within fifteen days following the filing of plaintiffs' application and memorandum. The court admonishes both parties that they should attempt to reach an agreement on both damages and attorney's fees and should promptly communicate such agreement to the court. If no agreement is reached by the expiration of the time allowed above for the filing of defendant's fees response,

ter of whether its conduct was prohibited by the ADEA." *TWA*, 105 S.Ct. at 625. *TWA*, however, concerned the award of *liquidated damages,* not the determination of the applicable statute of limitations. The Court noted: "Even if the 'in the picture' standard were appropriate for the statute of limitations, the same standard should not govern a provision dealing with liquidated damages." *Id.* The Court emphasized the distinction between defining the term "willful" in

the context of the liquidated damages provision of the ADEA, and defining "willful" in terms of 29 U.S.C. § 255(a) concerning the applicable statute of limitations in Equal Pay Act cases. This circuit in a post-*TWA* decision has clearly adhered to the "in the picture" definition of "willful" in Equal Pay Act statute of limitations context, and the court's application of this standard is therefore not affected by the *TWA* decision. *See Brock,* 765 F.2d at 1039.

the court will set a hearing to consider the computation of damages and attorney's fees.

## ON MOTION FOR ATTORNEY FEES

After entering the Opinion and Order dated July 10, 1986, the court received a verified motion for attorney's fees, as well as memoranda from the respective parties concerning the computation of damages and the award of attorneys' fees. On December 2, 1986, the court held an evidentiary hearing and received further oral argument. At that time, the parties submitted exhibits, affidavits, and oral testimony. Thereafter, post hearing memoranda were submitted. The court has now fully considered these matters and enters the following Memorandum of Decision, which incorporates the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a). Except as modified herein, the Opinion and Order of July 10 remains in full effect.

## I. DAMAGES ISSUES

1. *Statute of Limitations*—The first issue confronting the court is the construction of the word "willful" in the statute of limitations section of the Portal-to-Portal Act, 29 U.S.C. section 255(a). A "willful" violation of the Equal Pay Act, 29 U.S.C. § 206(d), adds one year to the statute of limitations, significantly increasing General Motors' liability. In *Brock v. Georgia Southwestern College*, 765 F.2d 1026 (11th Cir.1985), the Eleventh Circuit reaffirmed

its commitment to the "in the picture" standard, which was pioneered in *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). Under this standard, a violation is "willful" if the employer knows or has reason to know that the Equal Pay Act governs its conduct. When the employer knows that the Equal Pay Act is "in the picture," its violation is "willful" regardless of the employer's good faith. *Brock v. Georgia Southwestern College*, 765 F.2d at 1039. General Motors has admitted that it knew that the Equal Pay Act governed its conduct. For three years prior to the time the plaintiffs filed this lawsuit, the plaintiffs continually protested General Motors' violation of their rights.

General Motors argues that the "in the picture" standard is no longer viable. Specifically, General Motors points to *Transworld Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), in which the Supreme Court elaborated a different construction of the word "willfulness."[1] Both the Third and Seventh Circuits have held that "willful" means the same thing throughout the Age Discrimination in Employment Act (ADEA) and Fair Labor Standards Act (FLSA). *See, e.g., Brock v. Richland Shoe Co.*, 799 F.2d 80, 82–83 (3rd Cir.1986); *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 308–312 (7th Cir.1986).[2] Under this view, *Thur-*

---

**1.** In fact, *Thurston,* addresses the construction of the word "willfulness" in a completely different context—an age discrimination action—where section 7(b) of the ADEA permits liquidated damages "only in cases of willful violations." 29 U.S.C. § 626(b). Although *Thurston,* rejected the *Jiffy June* "in the picture" analysis for liquidated damages under the ADEA, the Supreme Court expressly noted that the *Jiffy June* standard might be appropriate for statute of limitations questions. 105 S.Ct. at 625; *see also E.E.O.C. v. McCarthy,* 768 F.2d 1, 5 (1st Cir.1985). Differentiating between these two settings is consistent with the different purposes served by the ADEA's liquidated damages provision and a statute of limitations. Congress intended the liquidated damages provision of the ADEA to serve the same punitive purpose as § 16(a) of the FLSA, which imposes a criminal penalty for "willful" violations. It is not surprising that the Supreme Court relied upon

cases interpreting the FLSA criminal penalty provision in order to fashion a similar standard for applying section 7(b), its ADEA counterpart. *See Thurston,* 105 S.Ct. at 624. In contrast, a statute of limitations is not punitive but restitutionary: it extends the period for the recovery of back wages wrongfully withheld. *See Secretary of Labor v. Daylight Dairy Products, Inc.,* 779 F.2d 784, 789 (1st Cir.1985); *Donovan v. Bel-loc Diner, Inc.,* 780 F.2d 1113, 1117 (4th Cir.1985). This court does not believe that the Supreme Court's interpretation of one statute can be authority for the interpretation of another so strikingly different in purpose. In the absence of such authority, this court is bound by Eleventh Circuit precedent.

**2.** Apparently a majority of other jurisdictions continue to apply the "in the picture" standard. *See, e.g., Nolting v. Yellow Freight System, Inc.,*

*ston* supplies a uniform definition of "willful" for both statutes: "a violation is willful if the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." 105 S.Ct. at 625.

■ The *Thurston* reckless disregard standard requires an employer to make a "reasonable effort to determine whether the plan he is following would constitute a violation of the law." 105 S.Ct. at 624 (quoting *Nabob Oil Co. v. United States,* 190 F.2d 478, 479 (10th Cir.1951), *cert. denied,* 342 U.S. 876, 72 S.Ct. 167, 96 L.Ed. 659 (1951)).[3] In *Thurston,* TWA complied with this duty by seeking legal advice and consulting with the Union in an effort to conform its retirement policy to the ADEA. 105 S.Ct. at 625. In contrast, General Motors chose to ignore clear signs that its practices were illegal.[4] A violation rises to

the level of reckless disregard when an employer has the resources to conform its conduct to the law, but declines to make the effort.[5] *See, e.g., E.E.O.C. v. Westinghouse Electric Corp.,* 632 F.Supp. 343, 372 (E.D.Pa.1986); *Slider v. National Rollings Mills, Inc.,* No. 83–5929, slip op. (E.D.Pa. June 9, 1986) [Available on WESTLAW, DCT database]; *Gorman v. Continental Can Co.,* No. 76–C–908, slip op. (N.D.Ill. March 25, 1986) [Available on WESTLAW, DCT database]; *Jennings v. Lenox Hill Hospital,* No. 84–1081, slip op. (S.D.N.Y. January 22, 1986) [Available on WEST-LAW, DCT database]. This court finds that General Motors' conduct falls within both the *Thurston* and *Jiffy June* definitions of willfulness.

2. *Computation of Damages*—Both parties have submitted computations of the sums required to compensate the plaintiffs in accordance with the findings and conclu-

799 F.2d 1192 (8th Cir.1986); *Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345, 1349–50 (10th Cir.1986); *Secretary of Labor v. Daylight Products, Inc.,* 779 F.2d 784 (1st Cir.1985); *Donovan v. Bel-loc Diner, Inc.,* 780 F.2d 1113 (4th Cir.1985); *Soler v. G & U, Inc.,* 628 F.Supp. 720, 723–24 & n. 3 (S.D.N.Y.1986); *Brock v. El Paso Natural Gas Co.,* 644 F.Supp. 1202, 1208–09 (W.D.Tex.1986).

3. If an employer could escape the "reckless disregard" standard solely by obtaining a green light from its lawyers, it would be far too easy for a defendant to circumvent the requirements of the Act. *Cf. Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1141–42 (5th Cir.1972). It seems that the better law would require, at a minimum, good faith reliance on a colorable legal position. *See, e.g., Whitfield v. City of Knoxville,* 756 F.2d 455, 463–64 (6th Cir.1985) (violation not willful where case law unsettled and defendants rely upon a minority district court opinion); *E.E.O.C. v. Westinghouse Electric Corp.,* 646 F.Supp. 555, 563 (D.N.J.1986) (violation not willful when the United States government maintains policies similar to those of the defendant); *cf. Thurston,* 105 S.Ct. at 620 (summary judgment by district court in favor of defendants). Unfortunately, the case law interpreting "willfulness" under the *Thurston* definition defies any overarching legal analysis. *Compare Dreyer v. ARCO Chemical Co.,* 801 F.2d 651, 657–58 (3rd Cir.1986) (willful conduct involves element of outrage); *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 604 F.Supp. 962, 967 (E.D.Pa.1985) (no "willfulness" where management reviews discharges implicating the ADEA) *to Guthrie v. J.C. Penney Co., Inc.,* 803 F.2d 202, 209 (5th Cir.1986) (evidence of undue

pressure on plaintiff and early retirement policy supports a finding of willfulness); *Galvan v. Bexar County,* 785 F.2d 1298, 1307 (5th Cir.1986) *reh'g denied* 790 F.2d 890 (1986) (age discrimination willful where age was the explicit reason for not rehiring employee); *E.E.O.C. v. Great Atlantic and Pacific Tea Co.,* 618 F.Supp. 115, 118 (N.D.Ohio 1985) (ADEA violation willful when denial of severance pay was "deliberate, voluntary, and intentional."); *Slenkamp v. Borough of Brentwood,* 603 F.Supp. 1298, 1302 (W.D.Pa.1985) (material issue as to recklessness where employer posted no signs informing employees of their rights under the ADEA); *Elbe v. Wausau Hospital Center,* 606 F.Supp. 1491, 1499 (W.D.Wisc.1985) (conduct willful when there is a conscious decision to terminate plaintiff).

4. General Motors asserts that its officials acted pursuant to a "transfer pay policy." *Compare Thurston,* 105 S.Ct. 613 (1985) (good faith implementation of a facially neutral employment policy). This court has found, however, that the company never adopted such a policy. What General Motors characterizes as a corporate policy was not a policy at all, but the practice of individual decisionmakers.

5. As an explanation for its conduct during settlement negotiations, General Motors has brought to this court's attention its policy of obtaining the resignation of employees who file discrimination claims as a condition precedent to settlement. This court feels obliged to point out that a policy of retaliatory discharge may be *per se* "willful" under *Thurston. See Powell v. Rockwell International Corp.,* 788 F.2d 279, 286 & n. 6 (5th Cir.1986).

sions expressed in the July 10 Opinion and Order. These figures are close and the parties have stipulated that they would "split the difference." The court therefore finds that the plaintiffs were undercompensated during the period beginning three years prior to the filing of suit and ending on the date of trial in the following amounts:

| | |
|---|---|
| Sheila Ann Glenn | $12,499.46 |
| Patricia F. Johns | $17,267.17 |
| Robbie Nugent | $21,897.29 |

■ 3. *Prejudgment Interest*—Whether or not liquidated damages are awarded, binding precedent in this circuit precludes the award of prejudgment interest. *See Barcellona v. Tiffany English Pub*, 597 F.2d 464, 469 (5th Cir.1979); *Foremost Dairies, Inc. v. Ivey*, 204 F.2d 186 (5th Cir.1953). Liquidated damages, if allowed, act as compensation for delay in the payment of sums due under the Act. *Id.* at 190.

■ 4. *Liquidated Damages*—The court finds that individual company officials held a good faith belief that General Motors had adopted a "transfer pay policy." In the July 10, 1986 Opinion and Order, the court concluded that such a finding was sufficient to establish a good faith defense, making an award of liquidated damages discretionary under 29 U.S.C. § 260. A further review of the case law in this circuit, however, has convinced the court that it applied the incorrect legal standard in reaching this result.

The purpose of a liquidated damages award is to encourage employers to make a good faith effort to ascertain and comply with the law. *Archambault v. United Computing Systems, Inc.*, 786 F.2d 1507, 1514 (11th Cir.1986). Accordingly, "good faith requires some duty to investigate potential liability under the FLSA." [6] *Wash-*

ington v. *Miller*, 721 F.2d 797, 804 (11th Cir.1983); *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468–69 (5th Cir. 1979). The Eleventh Circuit has taken a strict view: the good faith defense applies only when an employer innocently and to his detriment follows the law "as it was laid down to him by government agencies, without notice that such interpretations were claimed to be erroneous or invalid." *Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1579 (11th Cir.) *modified on other grounds*, 776 F.2d 265 (1985). *Accord E.E.O.C. v. Home Insurance Co.*, 672 F.2d 252, 263 (2d Cir.1982); *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658, 661 (4th Cir.1969).

■ General Motors argues that an employer sustains its burden of proof under section 260 by demonstrating a reasonable, albeit mistaken, belief that it was not violating the act. *See, e.g., Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 312 (7th Cir.1986); *Claymore v. Far-Mar-Co.*, 709 F.2d 499, 505 (8th Cir.1983); *Martinez v. Food City, Inc.*, 658 F.2d 369, 376 (5th Cir. Unit A 1981). Even under this less exacting standard, ignorance cannot form the basis for a reasonable belief.[7] *See, e.g., Doty v. Elias*, 733 F.2d 720, 726 (10th Cir. 1984); *Marshall v. Brunner*, 668 F.2d 748, 753 (3rd Cir.1982); *Brock v. El Paso Natural Gas Co.*, 644 F.Supp. 1202, 1209 (W.D. Tex.1986). There is no credible evidence that General Motors made any attempt to investigate its responsibilities. *See Sinclair v. Automobile Club of Oklahoma, Inc.*, 733 F.2d 726, 730 (10th Cir.1984); *Melanson v. Rantoul*, 536 F.Supp. 271, 293 (D.R.I.1982). General Motors has adduced neither case law nor administrative rulings to demonstrate that there were reasonable grounds to support a belief that its acts were in conformity with the law.[8] "A good heart but an empty head does not produce

---

6. In *Thurston*, the Supreme Court fashioned its definition of "willfulness" to reflect these same concerns. 105 S.Ct. at 625 n. 22.

7. A reasonable belief also cannot be based on a simple misunderstanding of the requirements of the Act. *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d at 1351.

8. General Motors has cited decisions which advance the hardly earthshaking proposition that a corporate policy can be lawful if based on a factor other than sex. In fact, General Motors could not have relied upon these cases because there was no transfer policy.

a defense." *Walton v. United Consumers Club, Inc.*, 786 F.2d at 312. The court concludes that it has no choice but to award liquidated damages.

## II. ATTORNEY FEES AGAINST GENERAL MOTORS

The court has given detailed consideration to the twelve factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–719 (5th Cir.1974). A more useful starting point for determining a reasonable attorney fee under more recent law, however, seems to be the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Pennsylvania v. Delaware County Citizens' Council For Clear Air*, — U.S. —, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986); *Hensley v. Eckerhardt*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The Supreme Court appears to recognize a strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a reasonable fee. *Delaware County Citizens' Council For Clean Air*, 106 S.Ct. at 3097; *Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). This calculation may subsume many of the twelve factors set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974). *See Delaware County Citizens' Council For Clean Air*, 106 S.Ct. at 3098; *Blum*, 465 U.S. at 896–900, 104 S.Ct. at 1547–1550; *Hensley*, 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9; *Jones v. Central Soya Co.*, 748 F.2d 586, 589 (11th Cir.1984); *United States v. Cert. Real Prop. Loc. at 4880 S.E. Dixie Highway*, 628 F.Supp. 1467, 1472 (S.D.Fla.1986).

### 1. *Reasonable Hours*

The court must exclude from its initial fee calculation hours that are not "reasonably expended." *Hensley*, 103 S.Ct. at

1939 (citing S.Rep. No. 94–1011, p. 6 (1976)), U.S.Code Cong. & Admin.News 1976, p. 5908. Plaintiffs' attorneys seek compensation for a total of 1889.1 attorney hours and 411 paralegal and law clerk hours. The reasonableness of this time and labor has been assessed in light of two other *Johnson* factors—the novelty and difficulty of the case and the result. *See Erkins v. Bryan*, 785 F.2d 1538, 1545 (11th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 455, 93 L.Ed.2d 402 (1986); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1137 (11th Cir.1984) *York v. Alabama State Board of Education*, 631 F.Supp. 78, 83 (M.D.Ala.1986).

■ This case was a routine disparate treatment case, although it may not have been the type of case plaintiffs' counsel ordinarily encounters. Such novel issues as there were did not present significant legal and factual hurdles. On the other hand, the court notes that plaintiffs' counsel obtained substantial benefits for their clients. When only the interests of the named plaintiffs are at stake, plaintiffs' attorneys should have in mind the actual amount in controversy, and this court would normally balk at awarding fees substantially in excess of that amount. *See Jones v. Central Soya Co., Inc.*, 748 F.2d 586, 591 (11th Cir.1984). In the present case, however, the plaintiffs' recovery may benefit other female employees who have been adversely affected by General Motors' discriminatory practices. *See City of Riverside v. Rivera*, — U.S. —, 106 S.Ct. 2686, 2694, 2700, 91 L.Ed.2d 466 (1986) (Brennan plurality) (Powell concurrence) (rejecting argument that "fee awards under section 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers").[9]

---

9. The plaintiffs were successful in all significant issues except their harassment claim. This claim was relatively insignificant and involved discrete issues of fact and law. *Compare City of Riverside*, 106 S.Ct. at 2692; *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. "A fee applicant should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *City of Riverside*, 106 S.Ct. at 2692; *Hensley*, 103 S.Ct. at 1941. Plaintiffs' records do not lend themselves to a determination of the time devoted to this losing issue. Nevertheless, the court credits Mr. Richardson's testimony that his firm spent *no more than 40 hours* pursuing this harassment claim.

■ Notwithstanding possible benefit to other female employees, the number of hours for which plaintiffs claim compensation is clearly unreasonable. The court has no doubt that plaintiffs' attorneys worked more hours than they actually claim. The actual figure exceeds 2300 hours. Even defendant's counsel has billed for substantially over a thousand hours. In contrast, defendant's expert witness, James P. Alexander, testified that the maximum amount of time that is reasonable for litigating this type of case would be approximately 625 hours. Under ordinary circumstances, the court would consider 625 hours as an absolute maximum, even if the case were hard-fought and vigorously contested.

Several factors contributed to this staggering waste of legal resources. First, plaintiffs' counsel simply overprepared, using three lawyers where one would suffice and expending twice the time on memoranda and briefs as was reasonably necessary. *See Jones v. Central Soya Company, Inc.,* 748 F.2d 586, 594 (11th Cir.1984). Counsel for the prevailing party must make a good-faith effort to exclude such excessive and redundant hours from a fee request just as a lawyer in private practice is ethically obligated to exclude such hours from his fee submission. *See Hensley,* 103 S.Ct. at 1939–40; *Erkins v. Bryan,* 785 F.2d 1538, 1545 (11th Cir.1986). More significantly, the relations between opposing attorneys in this case often degenerated into an acrimonious bickering context which proved to be enormously time-consuming.

General Motors' defense techniques also occasioned a great deal of extra work. General Motors has been stubbornly litigious and has adopted an obstructionist policy in responding to discovery. If General Motors had made a straightforward presentation of its claimed defense and willingly disgorged the information sought by the plaintiffs, this case should have con-

sumed no more than the 625 hours to which reference has been made. At every step of the way, however, General Motors has fully participated in the quibbling that has become the hallmark of this case. Two additional actions by General Motors are relevant.

First, General Motors now states that its standard practice is not to settle any discrimination case unless the complaining employee resigns. This position, the apparently nonnegotiable character of which was only recently revealed to the court, made settlement all but impossible. Nevertheless, General Motors continued to assure the court of its interest in negotiations and the court continued to pressure both sides to reach a settlement. Plaintiffs' counsel, who had been told that plaintiffs' resignation was essential to settlement, responded by embarking upon an expensive, time-consuming evaluation of the economic loss that plaintiffs would suffer as a consequence of resigning. The court finds that, under the circumstances, these undertakings were reasonable and necessary.

General Motors also injected needless work and expense into this case by adopting an "afterthought" defense. Specifically, General Motors contended that the plaintiffs were not entitled to as much compensation as certain male employees because these male employees utilized an additional skill, namely, working with blue prints. This clearly had no causal relationship with General Motors' discrimination against the plaintiffs. Although this contention was lacking in factual merit, it demanded a response. Plaintiffs' rebuttal required substantial discovery and expensive expert assistance. A defendant has the right to put on its case as it sees fit. This court does not criticize General Motors for exercising this right and its disposition is in no respect punitive.[10] General Motors,

---

**10.** At the conclusion of the evidence the court solicited post-hearing memoranda. At that time, it stated its tentative, nonbinding, impressions. Defendant takes strenuous exception to certain of the court's remarks. These comments were deliberately couched in provocative terms in a successful effort to elicit pointed memoranda. Counsel has made an unfortunate

misconstruction of those remarks, however, if they were perceived as reflecting any punitive disposition by the court. The misunderstood point is simply that defendants' own actions, in the two particulars discussed above, justified and indeed necessitated the expenditure of a great deal more time and money by plaintiffs' counsel than would otherwise have been reason-

however, cannot complain of the waste of time and resources precipitated by its own strategy. *See Hudson v. Deyton*, 770 F.2d 1558, 1575 (11th Cir.1985), *reh'g denied*, 777 F.2d 704 (1985).[11]

After considering all these facts and circumstances, the court concludes that 1200 hours was a reasonable expenditure of time by plaintiffs' counsel through the time of trial and to the present date. In disallowing a substantial portion of the hours expended, the court is aware of the desirability of making specific determinations with respect to each disallowed time segment. Unfortunately that is not possible in this case. The only specific item that can be so treated is the 40 hours spent on preparing the unsuccessful harassment claim. The remainder of the disallowance falls into a general category of counsel's simply exceeding the maximum number of hours that could ever be reasonable in this situation. The evidence supporting the fee application does not provide information necessary to a specific breakdown of such items as unnecessary preparation, uses of excessive personnel, and time spent in needless bickering. Nevertheless, the court is reasonably satisfied that, of the total hours expended, 1200, but no more than 1200, were reasonable under the attendant circumstances.

 Plaintiffs' fee application also seeks payment for 411 hours worked by paralegals and law clerks. Some of these hours were actually attorney hours that counsel voluntarily downgraded in the application. The court finds that this number

is also excessive and will limit this expense to compensation for 200 hours. This will reduce plaintiffs' reimburseable expenses by $7385.00.

## 2. Prevailing Market Rate

In determining the prevailing market rate, the court has considered the following *Johnson* factors: customary fee awards in similar cases; skill required to perform the legal services properly; the experience, reputation and ability of the attorneys; the contingent nature of the fee; undesirability of the case; time limitations; preclusion of other employment; and the nature and length of professional relationship with the clients. *See York v. Alabama State Board of Education*, 631 F.Supp. 78, 84 (M.D.Ala.1986).

In this district, awards in employment discrimination cases taken on a contingency fee basis range from $90 to $150 per hour. This approximates the customary fee for similar work in this community, which ranges from $90 to $125 per hour. This case required the skill of a competent trial attorney experienced in federal litigation. The firm of Bell, Richardson, Herrington, Sparkman, and Shepard is one of the oldest and best known firms in North Alabama. Insurance companies, railroads and large corporations form the bulk of the firm's clients.[12] As a result, most of the members of the firm lack experience litigating discrimination cases for a plaintiff. Nevertheless, plaintiffs' counsel displayed extraordinary skill and fully anticipated every development at trial.[13] This case would be con-

---

able. This substantial expense must be borne by defendant.

**11.** This court is satisfied that the number of hours plaintiffs' counsel reasonably devoted to this case is at least equal to the time expended by the defense counsel. The defendants have not argued that their representation was more involved than the representation of plaintiffs. *See Hudson v. Deyton*, 770 F.2d 1558, 1574 (11th Cir.1985), *reh'g denied*, 777 F.2d 704 (1985); *Naismith v. Professional Golfers Association*, 85 F.R.D. 552, 563 (N.D.Ga.1979).

**12.** The senior partner, Patrick W. Richardson, one of the attorneys in this case, is a past president of the state bar association and a distinguished leader among the bar of this

court. John A. Wilmer, who also worked on this case, practices almost exclusively in the labor field and has had several years experience representing management. James H. Richardson, who acted as lead counsel, routinely handles important matters for his firm. Mr. Richardson displays an ability which belies the fact that he has practiced law for only six years. Gabrielle Wehl has also practiced law for six years; however, she has experience in this type of litigation.

**13.** Their performance is all the more impressive because defense counsel are among the most highly skilled of Alabama attorneys practicing in this field. Notwithstanding the court's lack of enthusiasm for much that has taken place,

sidered an undesirable one for the Richardson firm: corporate clients do not applaud lawyers who represent employees in discrimination actions. In fact, plaintiffs' counsel found it necessary to mollify several of their clients while handling this case.

On the other hand, there is no reason why this case should have taken priority over other cases. Similarly, there is no indication that this case caused plaintiffs' counsel to turn down other work except for the fact that it was so time consuming. The court understands that this is a one-time undertaking by the plaintiffs' counsel and that there is no ongoing professional relationship between the plaintiffs and the Richardson firm.

The court finds that an average hourly fee of $110.00 is reasonable under all of the circumstances presented and that such rate reasonably reflects the prevailing market rate for work performed by similarly situated attorneys in similar employment discrimination cases.[14]

### 3. *Lodestar Calculation*

The product of the attorneys' compensable time and this average market fee is one hundred thirty-two thousand and no/100 dollars ($132,000.00). The court also awards thirty-four thousand nine hundred seventy-nine and 44/100 dollars ($34,979.44) in expenses, which the courts finds to have been reasonably expended under the circumstances for paralegals, law clerks, fee counsel, general office litigation expenses and expert witnesses.

### III. SUMMARY

Plaintiff Sheila Ann Glenn is entitled to judgment in the amount of twenty-four thousand nine hundred ninety-eight and 91/100 dollars ($24,998.91).

Plaintiff Patricia F. Johns is entitled to judgment in the amount of thirty-four thou-

sand five hundred thirty-four and 33/100 dollars ($34,534.33).

Plaintiff Robbie Nugent is entitled to judgment in the amount of forty-three thousand seven hundred ninety-four and 57/100 dollars ($43,794.57)

Bell, Richardson, Herrington, Sparkman and Shepard, P.A. is entitled to an award of one hundred thirty two thousand dollars ($132,000.00) in fees and thirty four thousand nine hundred seventy nine and 44/100 dollars ($34,979.44) in expenses for their services in representing the plaintiffs.

An appropriate Order will be entered.

---

defense counsel displayed outstanding ability and a tenacious dedication to their client's cause.

**14.** The court would very much prefer to calculate a lodestar figure for each attorney separately. Unfortunately, it is simply impossible to

allocate the unsuccessful, unnecessary and redundant hours among the attorneys. For this reason, the court has resorted to an average figure which it finds to be reasonable when the work of all of plaintiffs counsel is considered.