Patricia COVINGTON,
Plaintiff-Appellant,

v.

SOUTHERN ILLINOIS UNIVERSITY,
et al., Defendants-Appellees.

No. 86–1445.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1986.
Decided April 9, 1987.

John H. Bisbee, Macomb, Ill., for plaintiff-appellant.

Don E. Prosser, Gilbert, Kimmel, Huffman & Prosser, Ltd., Carbondale, Ill., for defendants-appellees.

Before CUMMINGS and CUDAHY, Circuit Judges, and MAROVITZ, Senior District Judge.*

CUDAHY, Circuit Judge.

Patricia Covington, an assistant professor of art at Southern Illinois University's Carbondale campus ("SIU"), sued the university under Title VII, 42 U.S.C. § 2000e *et seq.* (1982), and the Equal Pay Act (the "EPA"), 29 U.S.C. § 206(d) (1982), claiming that SIU discriminated against her on the basis of sex by paying her less than her male predecessor for performing the same work.[1] After a bench trial, the district

---

* Honorable Abraham L. Marovitz, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Covington sued, in addition to SIU, a number of individual defendants, including the president of SIU, the dean of the College of Communications and Fine Arts, the director of the

School of Art and the members of the Board of Trustees of SIU. After resting her case, plaintiff agreed to dismiss all of the individual defendants except the president and the director of the School of Art. *Covington v. SIU, et al.,* No. 83–4138, mem. op. at 3 n. 1 (S.D.Ill. Feb. 24, 1986). The district court granted the defend-

court found for the university, and Covington appeals. We affirm.

## I.

SIU's College of Communications and Fine Arts contains, among other academic units, the School of Art and the School of Music. In the summer of 1971, Donald Lemasters became the academic advisor for art students, replacing Violet Trovillion, who was retiring. Lemasters held a bachelor of music degree from the St. Louis Institute of Music and a masters of music degree from Northwestern University. A masters of music degree is recognized by the School of Music of SIU as a "terminal" degree (i.e., a degree qualifying one for promotion and tenure) for faculty members teaching applied music. Prior to assuming the position of art advisor, Lemasters held a variety of positions outside of SIU as well as within the university. He was a professional trumpet player from 1942 until 1951. From 1948 through 1967, he was a band director at various grade schools, high schools and music camps; he taught part-time at high schools for five years. He was also a partner in a music store from 1952 until 1955 and sold musical instruments through 1972. Lemasters was initially employed by SIU during the late 1950's and early 1960's as a part-time lecturer in trumpet and French horn.[2] On the recommendation of the chairman of the School of Music, Lemasters was offered an assignment as a full-time instructor teaching brass instruments in August of 1967 at a salary of $900 per month. Lemasters was hired to fill a vacancy created by the military enlistment of Larry Franklin, a member of the music faculty.

Franklin returned to the School of Music in the fall of 1971, and as a consequence, Lemasters was transferred to the position of art advisor, apparently with the understanding that he would take over the responsibility of music advisement when the current music advisor retired. Lemasters made $1,080 per month during the 1970–71 academic year, and his salary did not change when he was assigned to the art advisor position. SIU's policy is that a faculty member's change of assignment does not result in a decrease in salary. Even though Lemasters advised art students, his official assignment was 75% to the College of Communications and Fine Arts and 25% to the School of Music; his salary was not part of the art school budget. In December 1971, Lemasters' salary was increased to $1,140 per month. He received tenure in the School of Music in the fall of 1972, and his salary was increased to $1,200 per month for the 1972–73 school year. During the 1973–74 academic year, Lemasters earned $1,280 per month.[3] Professor Milton Sullivan became the director of the School of Art in the fall of 1973, and he sought to have Lemasters replaced as art advisor because he was dissatisfied with his work. Lemasters was reassigned to the School of Music effective July 1, 1974 and taught full-time there from the fall of 1974 until his death in September 1981.

ants' motion for an involuntary dismissal as to these two remaining individual defendants because they were not "employers" for purposes of Title VII, 42 U.S.C. § 2000e(b) (1982), and the EPA, 29 U.S.C. § 203(d) (1982). Mem. op. at 13.

Covington claims on appeal that the district court erred in concluding that she had agreed to voluntarily dismiss the dean as a defendant. The transcript of the proceedings as to this point is ambiguous. Appellant's Appendix at 199a. However, even if the plaintiff did not dismiss the dean, the district court probably would have involuntarily dismissed him on the same basis that it dismissed the director and the president. In any event, Covington does not appeal the dismissal of any of the individual defendants.

In addition to her Title VII and EPA claims, Covington also brought a section 1983 claim, 42 U.S.C. § 1983 (1982), which was dismissed after she informed the district court that she was no longer pursuing it. Mem. op. at 3 n. 1.

**2.** Faculty rank at SIU, in ascending order, is as follows: lecturer, instructor, assistant professor, associate professor and professor. Mem. op. at 5.

**3.** During the time Lemasters was assigned as art advisor, he may have taught a class on trumpet repair. This point was not conclusively established at trial. Mem. op. at 8 & n. 3.

Sullivan recommended that the plaintiff be hired to replace Lemasters at a starting salary of $800 per month. At the time he proposed this salary, Sullivan was not aware what Lemasters was being paid because his salary did not come out of the School of Art's budget. According to Sullivan, Covington's initial salary was based upon an evaluation of the position of art advisor, her qualifications and guidelines specifying the ranges of salary by rank. In addition, at the time Covington was hired, the university was experiencing financial difficulties. Because Lemasters had not been paid out of the School of Art's budget, Sullivan had to request new funds to pay Covington's salary at a time when SIU was implementing cost-cutting measures that included the release of a number of faculty members.

In July 1974, Covington started work as art advisor at a salary of $800 per month. Covington had little teaching experience at the time she was hired by SIU. She had taught one year at the high school level and had been employed as a teaching assistant in the School of Art at SIU beginning in 1972 while she worked towards her masters degree in education. Although she received her masters degree in August 1974, this degree did not qualify her for tenure or promotion within the School of Art. As of August 1974, Covington performed all the advisement duties performed by Lemasters and, in addition, taught classes.

Covington did an outstanding job at SIU and received many merit pay raises. In December 1974, Covington's salary was increased to $879 per month. This raise was given as a result of an equity study undertaken by the university to identify those with inequitable salaries and to increase their salaries within the limits of available dollars. Covington's salary was raised for the 1975–76 school year to $987 per month. In June 1976, her duties were changed from 75% advisement and 25% teaching to 50% advisement, 25% teaching and 25% administration. Her salary was increased for the 1976–77 academic year to $1,032 per month; in December 1976 she received a second equity pay raise that increased her salary to $1,062 per month. During the 1977–78 school year, Covington earned $1,210 per month, and during the following academic year, she was paid $1,371 per month. Covington was granted tenure during the 1978–79 academic term but was denied a promotion to assistant professor because she lacked a terminal degree in art. She was promoted to assistant professor effective in the fall of 1980 upon being awarded terminal degree equivalency.

Covington was dissatisfied with her salary from the time she was first hired by SIU. She believed that Lemasters had been paid more money for doing the same or less work than she performed. When she questioned Sullivan about her salary, he mistakenly told her that Lemasters was an assistant professor, and thus, she believed that the discrepancy in pay was explained by the difference in their rank. Although Lemasters' correct rank was listed in public documents, it was not until February 1980 that Covington discovered that Lemasters held only the rank of instructor.

In April 1980, Covington wrote to the dean of the College of Communications and Fine Arts, C.B. Hunt, claiming that her salary was inequitably low. Covington also brought her claim to the attention of the academic vice-president, Frank Horton. Both Hunt and Horton refused to take any action in response to her complaint. Covington then addressed her plea to the acting president of SIU, Hiram Lesar, who told Covington that a grievance regarding her prior salary would be untimely but that she could file a grievance regarding her current salary. On June 11, 1980, Covington filed a grievance, and President Lesar appointed a grievance committee to advise him regarding her complaint. After comparing her salary with the salaries of other assistant professors, the committee recommended that her salary be adjusted to bring it within the range of these other faculty members. The university attempted to negotiate with Covington based on the findings of the grievance committee, but it was unable to reach an accommodation. Covington filed a charge with the

Equal Employment Opportunity Commission on March 18, 1981 and received her right to sue letter on March 19, 1983. She filed the present suit on June 9, 1983.

## II.

In the district court, Covington argued that the university discriminated against her by paying her $800 per month as a starting salary in 1974 when Lemasters made $1,080 per month in 1971 when he first began in the art advisor position and $1,280 per month during his last year in that post.[4]

The district court found that the plaintiff established a prima facie case under the EPA and Title VII: Covington established that she received less pay than a male for equal work requiring equal skill, effort and responsibility under similar working conditions. The defendants do not dispute this finding on appeal. Once a plaintiff has established a prima facie case of discriminatory compensation, the burden shifts to the defendant to establish by a preponderance of the evidence that the disparity is the result of the operation of any of three compensation methodologies (seniority, merit, or quantity or quality of production) or "any other factor other than sex." 29 U.S.C. § 206(d)(1)(i)–(iv) (1982).[5] The court found that the defendants sustained their burden of proving that the differential in pay between Covington's initial salary and Lemasters' salary during his term as art advisor was due to a factor other than sex:

> The salary last earned by Lemasters in his advisement capacity was based on his 5 years of full-time employment at SIU and his tenure status. Unlike plaintiff, Lemasters began his employment at SIU with a terminal degree in his field. He had also a certain local notoriety as a high school band director, while plaintiff's prior experience was quite limited. Plaintiff's initial salary of $800 per month was not a result of her sex, but rather was a reflection of her education and limited experience and the lack of available funds.

Mem. op. at 15–16. The district court also found that the salary disparity was explained in part by the university's sex-neutral policy of maintaining an employee's salary upon a change of assignment within the university and that Lemasters' initial salary of $900 per month as a music instructor "was a normal entry level salary considering his degree and prior experience." *Id.* at 15. The court found that the fact that SIU was undergoing financial difficulties at the time Covington was hired also accounted for the difference in salary; after Lemasters left the art advisor position, the School of Art had to request new salary dollars to pay Lemasters' successor. *Id.* at 16.[6]

## III.

On appeal, Covington contends that SIU did not carry its burden of establishing that the disparity in pay was caused by a factor other than sex. Plaintiff's primary argument is that factors other than sex for purposes of the EPA and Title VII are limited either to business-related reasons or, more narrowly, to factors that relate to the requirements of the job or to the individual's performance of that job. Covington contends that SIU's policy of retaining the salary of employees who change assignments does not fall within either of these categories. Covington further ar-

**4.** Covington also argued that the violation was of a continuing nature. She claimed that she would be making more now had she not started at such a low salary. In her view, she would have received the same number of merit raises even if her starting salary had been higher and these merit raises would have been higher because, she alleges, they were ultimately calculated as a percentage of her starting salary.

**5.** These four defenses are set out in the EPA. Although they do not appear in Title VII, the Supreme Court has concluded that Title VII effectively incorporates the four defenses for purposes of wage discrimination claims brought under Title VII. *County of Washington v. Gunther,* 452 U.S. 161, 168, 101 S.Ct. 2242, 2247, 68 L.Ed.2d 751 (1981).

**6.** As an alternative holding, the district court found that Covington's claim was barred by the statute of limitations. Mem. op. at 17–19. Because we conclude that Covington loses on the merits of her claim, we do not reach the district court's alternative holding.

gues that the university has offered no reason other than its salary retention policy to justify the difference between her salary and that of Lemasters.

The plaintiff's contention that factors other than sex must be related to the requirements of the particular position in question has not been adopted in this circuit and was implicitly rejected in two cases. In *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1261–62 (7th Cir. 1985), this court upheld as a factor other than sex a reorganization of the employer that resulted in a male employee's being paid more than his female predecessor who was discharged prior to the implementation of the reorganization plan. In *Ende v. Board of Regents of Regency Univs.*, 757 F.2d 176 (7th Cir.1985), male professors brought an EPA challenge to a university plan aimed at adjusting female faculty members' salaries in order to remedy past discrimination. The court upheld the plan as a factor other than sex even though it created isolated instances of salary disparities between female and male faculty members. *Id.* at 182–83. Neither the salary adjustment formula nor the reorganization was related to the performance of the employees who received the higher wage.

We conclude that SIU's salary retention policy qualifies as a factor other than sex. We do not believe that the EPA precludes an employer from implementing a policy aimed at improving employee morale when there is no evidence that that policy is either discriminatorily applied or has a discriminatory effect.[7] Although we realize that a plaintiff need not establish

discriminatory intent to recover under the EPA, we do not believe that the Act precludes an employer from carrying out a policy which, although not based on employee performance, has in no way been shown to undermine the goals of the EPA.

Covington cites a number of cases which suggest that courts should be wary of allowing employers to rely on employees' differing salary histories to explain present wage disparities. *See, e.g., Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir. 1982) ("a factor like prior salary ... can easily be used to capitalize on the unfairly low salaries historically paid to women"); *Futran v. RING Radio Co.*, 501 F.Supp. 734, 739 n. 2 (N.D.Ga.1980) (Vining, J.) (giving prior salary more than nominal consideration perpetuates historic employment discrimination in wages suffered by females); *Neeley v. MARTA*, 24 FEP Cases (BNA) 1610, 1612 (N.D.Ga.1980) (Vining, J.) (employer's practice of not paying employees more than 110% of previous salary perpetuates lower salary of women that might be the result of prior sex discrimination). The concern in these cases is that, although the policy of considering an employee's prior salary in setting his or her current wage is not objectionable in itself, this policy may serve to perpetuate an employee's wage level that has been depressed because of sex discrimination by a previous employer.

But the issue before us is somewhat different than that decided in cases such as *Kouba*. The question here is whether the university can consider the prior wages that *it* paid an employee, rather than the wages paid by a previous employer. In

---

7. On appeal, the university claims that it adopted its salary retention policy to promote employee morale. Appellees' Brief at 19. An alternative explanation seems to have been offered in the district court. There was evidence suggesting that Lemasters was transferred to the art advisor position as a temporary measure and that he would be transferred back into the School of Music to assume the position of music advisor when that post was open. In discussing the factor other than sex exception, the House Report accompanying the Equal Pay Act recognized:

> [I]t is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to have them available when they are again needed for their former jobs.

House Comm. on Equal Pay Act of 1963, H.R. Rep. No. 309, 88th Cong., 1st Sess. 3, *reprinted in* 1963 U.S.Code Cong. & Admin.News 687, 689. Defendants do not press this position on appeal, probably because it is not clear from the evidence that Lemasters was in fact transferred to art advisement with the intention that he would eventually take over a similar role in music and because the university's policy of maintaining salaries seems to be applied to faculty transfers in general, even if the new assignment is not temporary.

*Kouba,* the court did not require that the discrimination by the prior employer be established, presumably because of the enormous difficulties involved in determining whether another business discriminated on the basis of sex resulting in lower wages for its female employees. Rather, the court noted that the plaintiff's lower wages *might* be due to prior discrimination, and because of this possibility, it held that prior salary could be a factor other than sex only if its use was business-related and it was actually taken into account in line with the employer's stated purpose. *Kouba,* 691 F.2d at 876. In cases like the one before us, however, in which the wage policy of only the present employer is involved, any presumption of prior discrimination has no place. The present employer should be permitted to consider the wages it paid an employee in another position unless this policy is discriminatorily applied or unless there is evidence independent of the policy which establishes that the employer discriminates on the basis of sex.[8] *See, e.g., Grove v. Frostburg Nat'l Bank,* 549 F.Supp. 922, 937 (D.Md.1982) (court upheld as a factor other than sex employer's policy of not reducing salaries when employees were transferred or when their job assignments were changed); *Mangiapane v. Adams,* 19 Empl.Prac.Dec. (CCH) ¶ 9030 at 6414 (D.D.C.1979) [Available on WEST-LAW, DCTU database] (agency's decision

to maintain higher wages of incumbent program analysts after position had been downgraded was not unlawful even though new hires were paid at a lower rate: practice did not perpetuate prior unlawful discrimination, was not based on considerations of sex and was not discriminatory in application). Maintenance of an employee's compensation in a transfer between positions is not in our view unusual and avoids the serious problem of "unmerited" pay reductions.

Covington does not argue that the salary retention policy was applied discriminatorily. Her position is that SIU discriminated against her on the basis of sex in setting her starting salary. Covington argues that the university has offered no reasons related to job performance to explain the disparity between the salary at which she was hired and that paid Lemasters while he was art advisor. Appellant's Brief at 26.

■ We have already rejected Covington's premise that factors other than sex must be related to the higher paid employee's performance. The district court concluded that the disparity in salary between Covington and Lemasters resulted because of differences in education and experience and because of SIU's salary retention policy.[9] Our review of the district court's findings that these factors explained the salary

8. Of course, if the current employer considered prior salary in setting an employee's initial salary, the same concerns that underlie *Kouba* would still be relevant. In this case, neither party has suggested that SIU took Covington's prior salary into account when it set her starting salary.

9. Plaintiff contends that factors such as experience and education are considered in determining whether the plaintiff has established her prima facie case (i.e., equal pay for equal work) and thus cannot be raised by the defendants as a factor other than sex. Plaintiff relies primarily on *Patkus v. Sangamon-Cass Consortium,* 769 F.2d 1251, 1260 (7th Cir.1985), in which the court stated that it would not consider the male employee's higher educational qualifications as a factor other than sex because "the Equal Pay Act looks to the similarity of the actual duties involved, and does not turn on differences in job descriptions, prior training, or other factors" (citation omitted). However, any difference in

educational qualifications was irrelevant to the outcome of *Patkus* because the court there concluded that the disparity in pay was the result of the employer's implementation of a plan of reorganization, which qualified as a factor other than sex.

It seems clear from the legislative history of the Equal Pay Act that factors such as experience and education operate as a defense rather than as part of the plaintiff's prima facie case. In discussing the factor other than sex exception, the committee report accompanying the House bill stated:

Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on *experience, training,* or ability would also be excluded.

House Comm. on Equal Pay Act of 1963, H.R. Rep. No. 309, 88th Cong., 1st Sess. 3, *reprinted in* 1963 U.S.Code Cong. & Admin.News 687, 689 (emphasis supplied).

disparity is governed by the clearly erroneous rule. Fed.R.Civ.P. 52(a).

When Lemasters was first hired by the School of Music in 1967 as a full-time instructor, he was paid $900 per month. At the time he was hired, Lemasters had considerable experience in the field of music, including extensive teaching experience. He also possessed a degree that qualified him for tenure and promotion within the School of Music. The district court found that Lemasters' initial salary "was a normal entry level salary considering his degree and prior experience." Mem. op. at 15. Lemasters received periodic raises between 1967 and 1971; by the time he transferred to the art advisement position, he was making $1,080 per month, and he kept this salary under SIU's salary retention policy. While Lemasters was art advisor, he received tenure in the School of Music. When he left the art advisor position to return to the School of Music in 1974, his salary was $1,280 per month. When Covington was hired in 1974, her teaching experience was much more limited than was Lemasters' at the time he was hired by SIU in 1967. Covington also lacked a degree that would qualify her for tenure and promotion within the School of Art. Plaintiff does not contest these factual findings. Instead, she contends that none of these differences in qualifications and education enhanced Lemasters' ability as an art advisor. Appellant's Reply Brief at 9. This contention may well be correct, but Equal Pay Act analysis is not so simple.

■ The flaw in Covington's argument is that Lemasters' starting and ending salaries as art advisor were influenced by his previous period of employment in the School of Music. Lemasters spent his first four years at SIU as a music instructor, and his degrees in music and prior experience teaching music and operating a music store were relevant to the salary he was paid in that position. He started in the art advisor position at a salary of $1,080 because he had received periodic increases during the four years he taught in the School of Music, and he retained his salary upon transfer. During the three years he

served as art advisor, his salary was gradually raised to $1,280 per month. The district court found that the increases that Lemasters received during this period were based on his years of full-time employment with SIU and the fact that he was tenured. At the time Covington was hired, Lemasters had seven years experience at the university and was tenured; although his formal training was in the field of music, he had three years experience in the art advisor position at the time he left that post.

The district court concluded that Covington's low starting salary was also the result of the financial emergency that SIU was experiencing at the time she was hired. Mem. op. at 16. Lemasters' salary had not been paid out of the budget of the School of Art; when he left the art advisement position, the School of Art had to request additional funds to pay his successor. Plaintiff does not contest the existence of the financial emergency. Appellant's Reply Brief at 10. Instead, because it was the policy of the university that its financial problems would not alter its obligations under its affirmative action programs, including its obligations under the EPA, Covington argues that SIU cannot use the financial emergency to explain her low starting salary. The section of the resolution declaring the financial emergency, to which plaintiff directs our attention, states that cutbacks in programs and services will be made "without sacrificing the University's duty and commitment to an Affirmative Action Program." *Resolution Declaring Financial Exigency on the Basis of IBHE FY75 Budget Recommendations and Directing Certain Administrative Actions* at 669 (the "*Resolution* "), Appellant's Appendix at 295.

■ This argument may appear to undermine SIU's ability to use its financial crisis as a factor other than sex justifying a disparity in pay. But this provision of the *Resolution* is somewhat vague, and it would be difficult to read into it a specific commitment on pay. The Board may simply have meant that it would pay careful attention to the position of women and

minorities within the university, not that it would refrain from across the board salary reductions for new employees. Even if the university may not raise its financial crisis as a factor other than sex, however, the other reasons for the disparity found by the district court sufficiently explain the difference in salary.[10] Covington herself concedes that if Lemasters' prior salary history is a factor other than sex, the university need not rely on the financial emergency. Appellant's Reply Brief at 11.

## IV.

For the foregoing reasons, we affirm the determination of the district court that the university established that the disparity in salary between Covington and Lemasters was the result of a factor other than sex.

AFFIRMED

---

10. Covington also argues that the university may not use the financial emergency to explain her low salary because, during the existence of this fiscal crisis, Lemasters received a $57 per month increase in salary when he transferred back to the School of Music in 1974. The resolution issued by SIU's Board of Trustees, however, states that cutbacks are to be made "without sacrificing salary increases." *Resolution* at 669, Appellant's Appendix at 295.