Sheila Ann GLENN, Patricia F. Johns, and Robbie Nugent, Plaintiffs–Appellees,

v.

GENERAL MOTORS CORPORATION, Defendant–Appellant,

Saginaw Steering Gear Division, Defendant.

No. 87–7171.

United States Court of Appeals, Eleventh Circuit.

April 15, 1988.

Charles A. Powell, Barry V. Frederick, Birmingham, Ala., for defendant-appellant.

Douglas S. McDowell, McGuiness & Williams, Washington, D.C., for amicus curiae Equal Employment Advisory Council.

James H. Richardson, Gabrielle U. Wehl, John A. Wilmer, Bell, Richardson, Herrington, Sparkman & Shepard, Huntsville, Ala., for plaintiffs-appellees.

Before JOHNSON and CLARK, Circuit Judges, and DUMBAULD[*], Senior District Judge.

JOHNSON, Circuit Judge:

Sheila Ann Glenn, Patricia Johns, and Robbie Nugent filed suit against General Motors Corporation (GM) and its Saginaw Steering Gear Division, alleging violation of the Equal Pay Act.[1] The United States District Court for the Northern District of Alabama found for the appellees and awarded damages. *See Glenn v. General Motors Corp.*, 658 F.Supp. 918 (N.D.Ala. 1987). GM[2] timely appeals the district court's (1) determination that the appellees proved a prima facie case of gender discrimination, (2) rejection of GM's affirmative defense of a "factor other than sex" as the reason for the pay disparity, (3) determination that the willful character of GM's actions required application of the three-year, rather than two-year, statute of limitations, (4) determination that an award of liquidated damages was appropriate, and (5) award of expenses. We affirm in part, and reverse and remand in part.

## I. *Prima Facie Case*

"In order to make out a case under the Act, the [appellees] must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C.A. § 206(d)(1)); *accord Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1032 (11th Cir.1985).

The three appellees are employed in the Materials Management Department (previously Tool Stores Department) of the Saginaw Division of GM in three different plants near Athens, Alabama. The appellees currently work in the positions of Materials Management Expediter and Materials Follow-up Clerk, previously designated Follow-up and Associate Follow-up Tool and Die respectively. A follow-up basically ensures that adequate supplies of tools and operating materials are on hand in the GM plants to meet the minimum levels necessary to keep the plants running. Normally, each plant has three follow-ups, although GM has used less than three at times. Up to the time of suit, four women, including the appellees, (as well as men) had worked in the follow-up position. Appellee Nugent was hired in 1975, the first

[*] Honorable Edward Dumbauld, Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

1. The Equal Pay Act of 1963 provides in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C.A. § 206(d)(1).

2. The Equal Employment Advisory Council, substantially composed of employers subject to the Equal Pay Act, filed a brief amicus curiae in support of GM's position.

person to hold a follow-up position.[3]

No doubt exists that through 1985 all three appellees earned less than all their male comparators in the follow-up position in the Tool Stores Department. In fact, the most highly paid appellee made less through 1985 than the lowest paid man.[4] In addition, all the appellees received lower starting salaries as compared to those received by men hired near the same time.[5]

■ GM argued at trial, and argues in its brief on appeal, that the follow-up positions held by the female appellees were not the same follow-up positions as held by their male comparators.[6] Specifically, GM argues that the male follow-ups who handle items ordered from blueprints need different skills than those follow-ups, including the appellees, who do not. The district court rejected this distinction:

> The court finds that for all purposes material to this case the positions of Blueprint Follow–Up and Follow–Up are identical. The court notes that GM has never treated Follow–Ups differently for compensation purposes on the basis of items handled. When plaintiff Nugent handled blueprint items, for example, she still made less than a male Follow–Up who did not. Some of the men handling blueprint items currently make less money than other men who do not work with blueprint items.

658 F.Supp. at 923. Consequently, the district court concluded that the appellees had proved a prima facie case.

Appellate review examines whether this determination was "clearly erroneous." *Georgia Southwestern*, 765 F.2d at 1033. Under the "clear error" standard of review, evidence in the record as a whole does not indicate that the blueprint reading, even if it is an actual distinction, makes the jobs not "substantially equal." *See id.* at 1032 ("The jobs held by employees of opposite sexes need not be identical, rather they must only be 'substantially equal.' It is important to bear in mind that the prima facie case is made out by comparing the *jobs* held by the female and male employees and showing that these jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs." (citations and footnote omitted) (emphasis in original)).

## II. *GM's Affirmative Defense*

Once the appellees established a prima facie case, the burden shifted to GM to prove that the difference in pay was justified by one of the four exceptions in the Equal Pay Act: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of

**3.** We take the facts set forth in this paragraph from the district court's opinion. *See* 658 F.Supp. at 920.

**4.** In 1985 the monthly salaries (along with gender and starting date as a follow-up) were: Stephen Downs (man, Feb. 1977) $2775; Jerry Pepper (man, July 1981) $2740; Billy White (man, April 1981) $2600; Harold Wales (man, Jan. 1981) $2485; Robbie Nugent (woman, 1975) $2385; Sheila Ann Glenn (woman, Feb. 1981) $2370; and Patricia Johns (woman, Feb. 1981) $2271. *See* 658 F.Supp. at 920–22.

**5.** Robbie Nugent (woman) made $600/month when she started in 1975. Richard Tanley (man) started two months later and made $660/month. Sheila Ann Glenn (woman) and Patricia Johns (woman) had monthly salaries of $1441.44 and $1316.64 respectively when they started in February 1981. Billy White (man) started two months later with a salary of $1656.46 per month. *See* 658 F.Supp. at 920–22.

**6.** GM did not take this position at the start of the case. In its Dec. 20, 1983 answer, GM stated, "The defendant admits that male and female 'followups' perform the same work...." On April 1, 1986, GM filed an amended answer, stating that "[t]he defendant denies that the jobs occupied by the plaintiffs are the same or substantially the same as jobs occupied by the males to whom they compare themselves."

Although GM contested this issue in its brief on appeal, GM appeared to abandon its challenge on this issue at oral argument. At oral argument, GM's counsel stated, "This case is, as I've said, brought under the Equal Pay Act by three ladies who contend that they made less money for doing the same work than men who were—who were under the same job titles. That contention is correct. We've never denied that." In addition, when GM's counsel listed the issues on appeal at oral argument, he did not include a challenge to whether the appellees had proved a prima facie case. Nonetheless, we address the merits of this contention.

production; or (iv) a differential based on any factor other than sex. 29 U.S.C.A. § 206(d)(1); *see Corning Glass Works,* 417 U.S. at 196, 94 S.Ct. at 2229; *Georgia Southwestern,* 765 F.2d at 1036.

GM seeks to justify the pay disparity on the fourth ground—a "factor other than sex." From 1977 to its first collective bargaining agreement with the United Auto Workers (UAW) in 1982, GM, in an attempt to maintain a nonunion Alabama production force, set hourly wages at levels of parity with the national UAW contract in other locations.[7] Prior to 1977, another hourly wage schedule applied to all hourly employees, regardless of gender.

In the present case, Nugent was hired "off the street" as a salaried follow-up. Glenn and Johns transferred from their salaried secretarial positions. In contrast, the male comparators transferred from hourly wage jobs. GM contends that to encourage people to move out of hourly wage jobs into salaried tracks, it maintains a longstanding, unwritten, corporate-wide policy against requiring an employee to take a cut in pay when transferring to salaried positions such as those at issue in the present case. GM thus argues that this "policy" constitutes a "factor other than sex" and legitimizes the pay disparity.

The district court found that the "policy" suffered from a fatal flaw:

> [T]his so-called salary "policy" is in fact not a policy at all, but merely one aspect of a practice. In practice GM simply pays Follow–Ups what it takes to induce them to accept the employment. The court notes that historically companies may and do hire women at lower starting salaries. The court is thus unconvinced of GM's attempted justification for the pay disparity. The three female plaintiffs are being paid less money than their

male counterparts for equal work without justification.

658 F.Supp. at 924. Consequently, the district court held that GM had failed to prove an affirmative defense justifying the pay disparity.[8]

■ We affirm the district court. GM seeks to defend the pay disparity as a result of the market force theory. This Court and the Supreme Court have long rejected the market force theory as a "factor other than sex": "[T]he argument that supply and demand dictates that women *qua* women may be paid less is exactly the kind of evil that the [Equal Pay] Act was designed to eliminate, and has been rejected." *Georgia Southwestern,* 765 F.2d at 1037 (citing *Corning Glass Works,* 417 U.S. at 205, 94 S.Ct. at 2233 ("The differential arose simply because men would not work at the low rates paid women inspectors, and it reflected a job market in which Corning could pay women less than men for the same work. That the company took advantage of such a situation may be understandable as a matter of economics, but its differential nevertheless became illegal once Congress enacted into law the principle of equal pay for equal work."); *Brennan v. Victoria Bank & Trust Co.,* 493 F.2d 896, 902 (5th Cir.1974) (market force theory that a woman will work for less than a man is not a valid consideration under the Equal Pay Act); *Brennan v. City Stores, Inc.,* 479 F.2d 235, 241 n. 12 (5th Cir.1973) (same); *Hodgson v. Brookhaven General Hosp.,* 436 F.2d 719, 726 (5th Cir.1970) (same)).

GM argues that the legislative history supports its contention that prior salary can be a "factor other than sex." Under the facts of the present case, GM's argu-

---

7. Since 1982, the hourly wage rates are governed by the collective bargaining agreement between GM and the UAW. The collective bargaining agreement is irrelevant to the present case because all of the female appellees and the male comparators became follow-ups before 1982.

8. GM argues that the district court erred by requiring that the "policy" be in writing to quali-

fy as an affirmative defense. We do not read the district court's language, *see* 658 F.Supp. at 923–24, as relying on the absence of a writing per se. Rather, we read the district court as concluding that the absence of a writing in the context of other written policies provides independent support for its finding that the "policy" was, in fact, an illegal practice.

ment is without merit. The relevant legislative history provides:

> Three specific exceptions and one broad general exception are also listed. It is the intent of this committee that any discrimination based upon any of these exceptions shall be exempted from the operation of this statute. As it is impossible to list each and every exception, the broad general exclusion has also been included. Thus, among other things, shift differentials, restrictions on or differences based on time of day worked, hours of work, lifting or moving heavy objects, differences based on experience, training, or ability would also be excluded. It also recognizes certain special circumstances, such as "red circle rates." This term is borrowed from War Labor Board parlance and describes certain unusual, higher than normal wage rates which are maintained for many valid reasons. For instance, it is not uncommon for an employer who must reduce help in a skilled job to transfer employees to other less demanding jobs but to continue to pay them a premium rate in order to have them available when they are again needed for their former jobs.

H.R.Rep. No. 309, 88th Cong., 1st Sess. 3, *reprinted in* 1963 U.S.Code Cong. & Admin.News 687, 689.

The legislative history thus indicates that the "factor other than sex" exception applies when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business. The pay disparity at issue here does not result from any of these reasons. Consequently, resort to the legislative history does not support GM's position, but rather buttresses the district court's conclusion that a "factor other than sex" does not explain the pay disparity.

We recognize that our holding may contradict the Seventh Circuit's holding in *Covington v. Southern Illinois University*, 816 F.2d 317 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 146, 98 L.Ed.2d 101 (1987). In *Covington,* the defendant university argued that its salary retention policy, its financial emergency, and the male comparator's education and experience justified the pay disparity. The Seventh Circuit agreed with the university, and examined whether the salary retention policy alone could be a "factor other than sex."

The university had a sex-neutral policy of maintaining an employee's salary upon a change of assignment within the university. Covington argued that

> factors other than sex for purposes of the [Equal Pay Act] ... are limited either to business-related reasons or, more narrowly, to factors that relate to the requirements of the job or to the individual's performance of that job. Covington contend[ed] that [the university]'s policy of retaining the salary of employees who change assignments does not fall within either of these categories.

816 F.2d at 321. The Seventh Circuit rejected Covington's argument. The flaws of the *Covington* decision are that the Seventh Circuit implicitly used the market force theory to justify the pay disparity and that the Seventh Circuit ignored congressional intent as to what is a "factor other than sex." Consequently, we reject *Covington* because it ignores that prior salary alone cannot justify pay disparity.[9]

---

9. Contrary to GM's gloss, *Kouba v. Allstate Ins. Co.,* 691 F.2d 873 (9th Cir.1982), does not stand for the proposition that prior salary alone can justify pay disparity. In *Kouba,* the Ninth Circuit held that "the Equal Pay Act does not impose a strict prohibition against the use of prior salary." *Id.* at 878. The Ninth Circuit added that "while we share the district court's fear that an employer might manipulate its use of prior salary to underpay female employees, the [district] court must find that the business reasons given by [defendant] Allstate do not reasonably explain its use of the factor before finding a violation of the Act." *Id.* Allstate had claimed that it used prior salary to predict a new employee's performance as a sales agent. *Id.* The Ninth Circuit held that strict relevant considerations needed to be evaluated on remand to decide whether Allstate could rely on prior salary. *Kouba* is consistent with the present case because the Ninth Circuit would permit use of prior salary where the prior job resembled the sales agent position and where Allstate relied on other available predictors. In the present case, GM does not argue that the males' hourly wages serve to predict that males will be better follow-

**1572**

### III. *Statute of Limitations*

■ The applicable statute of limitations for the present case is provided in 29 U.S. C.A. § 255(a): "[E]very [cause of] action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." The district court first determined that under the *Jiffy June* "in the picture" standard,[10] GM's actions were willful. 658 F.Supp. at 926.

GM does not contend that it met the *Jiffy June* "in the picture" standard, but rather argues that the Supreme Court disavowed that standard in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). *Thurston* addressed the definition of "willful" for liquidated damages under the Age Discrimination in Employment Act. The Supreme Court rejected the *Jiffy June* standard and held that a violation was "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Id.*

at 128–29, 105 S.Ct. at 625. The Court, however, expressly did not determine if the "in the picture" standard was appropriate for statute of limitations purposes. *Id.* at 127–28, 105 S.Ct. at 624–25.[11]

After the Supreme Court decided *Thurston*, however, this Court applied the *Jiffy June* standard to the precise issue presented by this appeal (i.e., the definition of "willfulness" for a statute of limitations connected with an Equal Pay Act claim). *Georgia Southwestern*, 765 F.2d at 1038–39. GM seeks to avoid *Georgia Southwestern*'s binding character by pointing out, and correctly so, that this Court did not discuss *Thurston*'s impact in that case. Even if the lack of discussion concerning *Thurston* would allow us to examine the controlling character of *Georgia Southwestern*, we would adhere to the *Jiffy June* standard. The district court persuasively noted that the liquidated damages provision is punitive in nature, and that the statute of limitations has a restitutionary function. 658 F.Supp. at 926 n. 1. Consequently, "willful" can have differing definitions based upon the underlying purpose of the provision.[12]

---

ups than the female appellees. Nor does the evidence in the record as a whole support that GM could resort to any other factor than the prior salary to justify the pay disparity.

Nor does *EEOC v. Aetna Ins. Co.*, 616 F.2d 719 (4th Cir.1980), support GM's position. Contrary to GM's gloss, *Aetna* does not stand for the proposition that pay disparity is justified when it results from two distinct nondiscriminatory merit systems. Rather, the Fourth Circuit validated the differential because of the male comparator's experience and background. *Id.* at 726. In contrast, GM justifies the disparity on the basis of the systems alone, without record support that experience and background justify the pay disparity.

**10.** This Court's predecessor examined the meaning of "willful" in *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139 (5th Cir.1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). The Court reasoned:

The entire legislative history of the 1966 amendments of the [Fair Labor Standards Act] indicates a liberalizing intention on the part of Congress. Requiring employers to have more than awareness of the possible applicability of the FLSA would be inconsistent with that intent. Consequently, we hold that employer's decision to change his employees' rate of pay in violation of FLSA is

"wilful" [sic] when, as in this case, there is substantial evidence in the record to support a finding that the employer knew or suspected that his actions might violate the FLSA. Stated most simply, we think the test should be: *Did the employer know the FLSA was in the picture?*
458 F.2d at 1142 (emphasis added).

**11.** On October 5, 1987, the Supreme Court granted certiorari on this issue. *See Brock v. Richland Shoe Co.*, —— U.S. ——, 108 S.Ct. 63, 98 L.Ed.2d 27 (1987).

**12.** Our holding accords with the post-*Thurston* decisions of the First, Fourth, Ninth, and Tenth Circuits. *See Secretary of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 789 (1st Cir. 1985); *Donovan v. Bel–Loc Diner, Inc.*, 780 F.2d 1113, 1117 (4th Cir.1985); *Brock v. Shirk*, 833 F.2d 1326, 1329 (9th Cir.1987); *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1349–50 & 1350 n. 6 (10th Cir.1986).

Our holding conflicts with the post-*Thurston* decisions of the Second, Third, Fifth, and Seventh Circuits. *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1061–62 (2d Cir.1988); *Brock v. Richland Shoe Co.*, 799 F.2d 80 (3d Cir.1986), *cert. granted*, —— U.S. ——, 108 S.Ct. 63, 98 L.Ed.2d 27 (1987); *Peters v. City of Shreveport*, 818 F.2d 1148, 1167–68 (5th Cir.1987), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 1101, 99 L.Ed.2d 264 (1988).

■ The district court alternatively held that GM failed *Thurston*'s reckless disregard standard. 658 F.Supp. at 927. We affirm the district court on this alternative ground as well. GM showed reckless disregard because, as noted above, GM sought to rely on the market force theory, a theory long discredited by this Court and the Supreme Court.[13]

## IV. *Liquidated Damages*

■ Under 29 U.S.C.A. § 216(b), affected employees shall recover liquidated damages from their employer for violations of the Equal Pay Act. An employer may avoid the mandatory nature of an award of liquidated damages if the court chooses not to make an award where the employer shows its actions were in good faith and shows it had reasonable grounds for believing that those actions did not violate the Equal Pay Act. *See* 29 U.S.C.A. § 260.

The district court initially held that GM's violation of the Equal Pay Act was in good faith and predicated upon reasonable grounds. It therefore did not award liquidated damages. 658 F.Supp. at 925. The district court later awarded liquidated damages, determining that, although individual GM officials held a good faith belief that

GM had adopted a transfer pay policy, GM lacked reasonable grounds to support a belief that its acts were in conformity with the law. *Id.* at 928.

We affirm the district court. As noted above, this Circuit and the Supreme Court have long discredited the market force theory. Consequently, GM could not have had reasonable grounds to support a belief that its acts were in conformity with the law.[14]

## V. *Expenses*

In addition to awarding damages to the appellees and awarding attorney fees to the appellees' counsel, the district court also awarded the appellees' counsel $34,979.44 in expenses, which the district court found "to have been reasonably expended under the circumstances for paralegals, law clerks, fee counsel, general office litigation expenses and expert witnesses." 658 F.Supp. at 932. GM challenges the district court's award of expenses, particularly $12,614 as fees for two expert witnesses.[15] As support for its position, GM relies on *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, —— U.S. ——, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), a case decided after the district court awarded expenses in the present case.

---

*Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 308–12 (7th Cir.1986).

We recognize that the Fifth Circuit no longer adheres to *Jiffy June*, a decision binding on us in the Eleventh Circuit. In *Salazar–Calderon v. Presidio Valley Farmers Association*, 765 F.2d 1334 (5th Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986), the Court, in a case not involving the FLSA or a statute of limitations issue, remarked that *Thurston* overturned *Jiffy June*'s definition of willful. *Id.* at 1345. Seizing on this language, the Court held in *Peters*, a case addressing the statute of limitations under the Equal Pay Act, that *Salazar–Calderon*'s remark was controlling. 818 F.2d at 1167. *See Halferty v. Pulse Drug Co.*, 826 F.2d 2 (5th Cir.1987) (*Peters* requires that panel vacate its earlier holding that *Jiffy June* required a three-year statute of limitations). We choose not to follow the Fifth Circuit's disapproval of *Jiffy June*, especially because the Fifth Circuit did not examine the restitutionary policy underlying the statute of limitations.

13. Because of our holding we express no view on the merits of the district court's observation that

[a]s an explanation for its conduct during settlement negotiations, General Motors has brought to this court's attention its policy of obtaining the resignation of employees who file discrimination claims as a condition precedent to settlement. This court feels obliged to point out that a policy of retaliatory discharge may be *per se* "willful" under *Thurston.*

658 F.Supp. at 927 n. 5; *see Powell v. Rockwell International Corp.*, 788 F.2d 279, 286 & n. 6 (5th Cir.1986).

14. We note that our conclusion in the context of the discussion on the statute of limitations issue that GM's actions met *Thurston*'s definition of "willful" precludes a finding of good faith on the part of GM. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1561 (11th Cir.1988) ("[U]nder the *Thurston* definition to find 'good faith' after a finding of 'willful' violation is illogical; the two terms are now mutually exclusive.").

15. The district court awarded $8,120 for Dr. Paul Lees–Haley, who was deposed, but did not testify, and awarded $4,494 for Dr. William Farrar, who was deposed and did testify.

We begin our analysis with the language of 29 U.S.C.A. § 216(b), which provides in relevant part that "[t]he court in [an Equal Pay Act] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." We note from the outset that this Court has never determined whether Section 216(b) permits an award of expenses for expert witness fees.[16]

An analogy, however, is possible. This Court permits an award of expert witness fees in civil rights cases. *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. Jan. 1981) (en banc), *cert. dismissed*, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981).[17] The en banc Court looked to congressional intent and determined that recovery for expert witness fees allowed citizens to recover what it costs them to vindicate civil rights in court. *Id.*[18] Similar policies underlie Section 216(b), thereby suggesting that the district court properly awarded expert witness fees to the appellees.

Our analysis, however, would not be complete without an examination of the *Crawford Fitting* decision. In that case, the Supreme Court held "that absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S. C. § 1821 and § 1920." 107 S.Ct. at 2499.[19] Significantly, the Court broadly observed that

> [a]lthough Congress responded to our decision in *Alyeska* [*Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95

S.Ct. 1612, 44 L.Ed.2d 141 (1975) ] by broadening the availability of attorney's fees in the federal courts, see ... 42 U.S.C. § 1988, it has not otherwise "retracted, repealed, or modified the limitations on taxable fees contained in the 1853 statute and its successors." Thus, we are once again asked to hold that a specific congressional enactment on the shifting of litigation costs is of no moment. We think that, as in *Alyeska*, Congress has made its intent plain in its detailed treatment of witness fees. We will not lightly infer that Congress has repealed §§ 1920 and 1821, either through Rule 54(d) or *any other provision not referring explicitly to witness fees*.

*Id.* (citations omitted) (emphasis added).

■ The Supreme Court's broad statement suggests that the district court erred in awarding expert witness fees because Section 216(b) does not refer explicitly to them. *Cf.* The Equal Access to Justice Act, 28 U.S.C.A. § 2412(d)(1)(A) ("[A] court shall award to a prevailing party other than the United States fees *and other expenses*, in addition to any costs awarded [as enumerated in 28 U.S.C.A. § 1920]...." (emphasis added)); *see also International Woodworkers of America v. Champion International Corp.*, 790 F.2d 1174, 1179 & n. 7 (5th Cir.1986) (en banc) (collecting the "numerous statutes expressly allow[ing] federal courts to award the full amount of expert witness' fees as costs of litigation").

**16.** In *King v. McCord*, 621 F.2d 205 (5th Cir. 1980), the prevailing plaintiff sought attorney fees of $30,000 and costs for expert witnesses of $5,888.45. The district court awarded a lump-sum figure of $2,000 for attorney fees and costs. This Court's predecessor expressly noted that the "[a]ppellant filed this appeal on the basis of the alleged inadequate fee award only." *Id.* at 206. Consequently, the expert witness costs question was not addressed.

**17.** The Fifth Circuit has overruled this aspect of the *Jones v. Diamond* opinion. *International Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174, 1175, 1180 (5th Cir.1986) (en banc).

**18.** The Court recognized that its holding contradicted the general rule that 28 U.S.C.A. § 1821 limits the expert witness fees award (currently a limit of $30 per day). This Circuit adheres to that general rule. *See Kivi v. Nationwide Mutual Ins. Co.*, 695 F.2d 1285, 1289 (11th Cir.1983) ("[I]t is well settled that expert witness fees cannot be assessed in excess of witness fees provided in § 1821."); *see also Osterneck v. E.T. Barwick Industries*, 825 F.2d 1521, 1530 n. 15 (11th Cir.1987) (dicta), *petition for cert. filed* (Jan. 15, 1988).

**19.** Section 1920(3) provides that witness fees may be taxed as costs. Section 1821(b) provides that a "witness shall be paid an attendance fee of $30 per day for each day's attendance."

One basis for distinguishing *Crawford Fitting* from the present case has been suggested.[20] Because *Crawford Fitting* involved only the award of costs pursuant to Federal Rule of Civil Procedure 54(d),[21] that case did not necessarily determine whether expert witness fees could be awarded pursuant to a fee-shifting statute.[22] We hold that the broad language in *Crawford Fitting* does not permit a distinction based upon whether or not the award is made under a fee-shifting statute.[23] The broad language in *Crawford Fitting* indicates that, although a statute may shift *attorney* fees, the statute does not operate to shift *witness* fees unless the statute refers explicitly to witness fees. In the present case, Section 216(b) does not refer explicitly to witness fees. In addition, nothing in the legislative history associated with Section 216(b)'s passage suggests that Congress intended the term "costs of the action" to differ from those costs as now enumerated in 28 U.S.C.A. § 1920. Consequently, we hold that the district court erred in awarding expert witness fees in excess of the amount permitted by 28 U.S.C.A. § 1821 and 28 U.S.C.A. § 1920. We thus remand this case to the district court so it may tailor the award of expert witness fees in accordance with this opinion. On remand, the district court also must

**20.** Three Supreme Court Justices noted that *Crawford Fitting* did not address whether a district court may award expert witness fees under Section 1988, an explicit fee-shifting statute. 107 S.Ct. at 2499 (Blackmun, J., concurring); *id.* at 2500 n. 1 (Marshall, J., dissenting) (joined by Brennan, J.).

**21.** Rule 54(d) provides in relevant part: "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs...."

**22.** The District Court of Massachusetts has seized on this distinction to award expert witness fees pursuant to Section 216(b). *Freeman v. Package Machinery Co.,* 1987 Westlaw 16456, at 13 (D.Mass. Sept. 2, 1987) ("Defendant's reliance on *Crawford* is misplaced because that opinion was inapplicable to cases involving explicit fee shifting statutes...."). *But see Eivins v. Adventist Health System/Eastern & Middle America, Inc.,* 660 F.Supp. 1255, 1264 (D.Kan. 1987) (expert witness fees under § 216(b) limited to $30 per day); *cf. Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1550 (10th Cir.1987) (Section 216(b) may permit expert witness fees as part of attorney fees, but parties stipulated to amount of attorney fees and court would not address issue; *court implicitly held that expert witness fees could not be part of costs awarded*).

**23.** Post-*Crawford Fitting* cases examining the issue pursuant to Section 1988 or other civil rights fee-shifting provisions have not permitted awards for expert witness fees. *See Boring v. Kozakiewicz,* 833 F.2d 468, 474 (3d Cir.1987) ("A prevailing party in a civil rights case is not entitled to tax [expert witness] fees as costs." (citing *Crawford Fitting* )); *Leroy v. City of Houston,* 831 F.2d 576, 584 (5th Cir.1987) ("Although [*Crawford Fitting* ] expressly considered whether [Rule] 54(d) could, in an antitrust case, override the statutory limit on witness fees, the Court's general reasoning leaves us no room to construe the Voting Rights Act provision here otherwise. The Voting Rights Act does not specifically allow recovery of expert witness fees, and we must reverse this portion of the district court's award." (citation omitted)); *ECOS, Inc. v. Brinegar,* 671 F.Supp. 381, 404 n. 12 (M.D.N.C.1987) (*Crawford Fitting* persuasive authority for holding that $30 per day limit governs § 1988 award for expert witness fees); *Alberti v. Sheriff of Harris County,* (S.D.Tex. Aug. 26, 1987) (same). *See also Catlett v. Missouri Highway & Transportation Commission,* 828 F.2d 1260, 1272 (8th Cir.1987) (in light of *Crawford Fitting,* defendant in Section 1983/Title VII case "will be free [on remand] to challenge the assessment against it of the class' expert witness fees). *Cf. Mennor v. Fort Hood National Bank,* 829 F.2d 553, 557 (5th Cir.1987) (in Title VII case, district court could award attorney's out-of-pocket costs because 28 U.S.C.A. § 1920 does not regulate those costs). *But see United States v. Yonkers Board of Education,* 118 F.R.D. 326, 330 (S.D.N.Y.1987) (*Crawford Fitting* does not preclude award of expert witness fees). *But cf. Jones v. City of Chicago,* 1987 Westlaw 19800, at 8–9 (N.D.Ill. Nov. 10, 1987) ("[A]lthough the costs defendants object to are in large part no longer allowable under Section 1920, they are allowable as part of the reasonable attorney's fees obtainable by the plaintiff under Section 1988 [for out-of-pocket expenses incurred by the attorney in preparation of trial].").

We recognize that, in contrast to the language of Section 1988 and 42 U.S.C.A. § 2000e–5(k) (Title VII's fee-shifting provision), the language of Section 216(b) is mandatory, favors plaintiffs only, and separates attorney fees from costs. In light of *Crawford Fitting*'s broad language and the absence in Section 216(b)'s legislative history of congressional intent to compensate plaintiffs fully for expert witness fees as part of the costs of the action, we attach no significance to the differences in statutory language.

ensure that only those items permitted to be taxed as costs are included in the award of expenses and that the amount of the award attributable to each of those items falls within the statutory limit as to that amount.

## VI. *Conclusion*

In conclusion, we AFFIRM that the appellees established a prima facie case under the Equal Pay Act. We AFFIRM that GM failed to prove the pay disparity resulted from a "factor other than sex." We AFFIRM that the three-year statute of limitations applied. We AFFIRM that liquidated damages were appropriate. We REVERSE and REMAND as to expenses awarded.